## F. R. OGG V. JOHN J. GLOVER.

No. 14,460.    (83 Pac. 1039.)

SYLLABUS BY THE COURT.

1. ELECTIONS—*Local Political Organization—City Ticket—Use of Circle.* A political party having only a local organization may nominate a ticket for city offices by a convention, primary election, or caucus, and have it placed upon the official ballot so that it may be voted for by a single cross-mark placed in a circle.

2. ——— *Nomination by Mass Convention—No Objection Filed —Ballot.* Where a certificate of nomination regular in form is filed with the city clerk, purporting to show the nomination of a full set of city officers by a mass convention of a party designated as the "city party," and no objection thereto is filed within three days, and the names so certified appear on the official ballot under the title "city ticket," over which a circle is printed with directions to place a cross-mark therein to vote a straight ticket, ballots cast at the ensuing election which are marked only in such circle cannot be rejected upon the grounds that the ticket was not nominated by a political party and that there was in fact no political party in the city known as the "city party."

3. ——— *Party Emblem Not Designated—Objection Not Made.* Where a certificate of nomination of candidates for city offices filed in behalf of a political party having only a local organization fails to show a party emblem, and no objection is made to the certificate prior to the election, ballots cast for the ticket of such party by making a cross in a circle printed above it cannot be rejected on account of the absence of an emblem.

4. ——— *Unsealed Ballots Filed with the Court—Evidence.* Ballots transmitted to this court unsealed, as a part of the evidence in an election contest, do not lose their probative effect from being temporarily entrusted by the clerk to the possession of the attorneys of one of the parties. No presumption that an attorney made any change in them arises from the fact that he had an opportunity to do so.

5. ——— *Marking of Ballots—Validity.* Rules for determining the validity of disputed ballots announced and applied.

Original proceeding in *quo warranto*. Opinion filed November 11, 1905. Judgment for plaintiff.

72   247
f72   700
f72   701

72   247
75   548

72   247
78   882

*S. T. Seaton, L. G. Ferrel, E. C. Owen,* and *Ogg & Scott,* for plaintiff.

*C. H. Potts, J. W. Parker, C. B. Little, C. W. Gorsuch, I. O. Pickering, J. P. Hindman, J. T. Little, C. L. Randall,* and *A. Smith Devenney,* for defendant.

The opinion of the court was delivered by

MASON, J.: This is an original proceeding brought to try the title to the office of mayor of the city of Olathe. The plaintiff and defendant were opposing candidates for that office at the last city election. The official canvass gave the defendant a majority of 126. He received the certificate of election, qualified, and is now acting as mayor. The plaintiff claims that a majority of the legal ballots were cast for him and that he is entitled to the office.

The defendant was an independent nominee. The plaintiff's name appeared upon a ticket printed upon the official ballot under the designation "city ticket," which bore no party emblem but at the head of which was placed a circle, under the words: "For a straight ticket, make a cross-mark in the circle below, and not elsewhere on the ballot." Some 252 ballots were cast having a cross-mark in this circle, and no other mark upon them. In the first and third wards such ballots were counted. In the second ward, where they numbered 126, they were rejected. If these ballots were void the plaintiff's case must fail. Otherwise the result depends upon a recount of 204 ballots, to each of which some specific objection is made by one party or the other.

The general objection made to the counting of ballots marked only in the circle over what was designated as the "city ticket" is that this ticket was selected, certified and printed under such circumstances that it could not be treated as a party ticket; that the candidates composing it were not entitled to the privilege of being voted for collectively, but that the voter could only effectively give them his support

by marking crosses in the squares opposite their several names. Three specific grounds are urged in support of this objection: (1) That under the statute only a political party having a national or state organization has a right to nominate candidates otherwise than by petition, or to use a circle in connection with a party ticket; that, as the framers of this ticket made no pretense to having more than a local organization, they had no such right. (2) That the ticket was not that of any political party whatever, and for that reason could not be voted for as a whole by means of a cross-mark placed in a circle. (3) That a circle can be employed only in connection with a party emblem, and, as no emblem was printed on this ticket, the circle could not rightfully be used. These contentions will be considered in the order stated.

The plaintiff concedes that he was not the nominee of a political party having a national or state organization, but claims that in a city election all the privileges of any political party, including the use of the circle in voting, may be exercised by one having merely a local organization, under the provisions of section 2696 of the General Statutes of 1901 (Laws 1901, ch. 177, § 1), which reads:

"All nominations made by political parties shall be known and designated as 'party nominations,' and the certificates by which such nominations are certified shall be known and designated as 'party certificates of nomination.' Party nominations of candidates for public office can be made only by a delegate or mass convention, primary election or caucus of qualified voters belonging to one political party having a national or state organization; provided, that party nominations for city officers may be made by a convention, primary election or caucus of qualified electors belonging to a political party having only a local organization. Party nominations so made shall, subject to the provisions of this act, be placed upon the official ballot."

The defendant relies upon this language of the next

section (Laws 1901, ch. 177, § 2; Gen. Stat. 1901, § 2697):

"Any political party having a state or national organization, by means of a delegate or mass convention, primary election, or caucus of qualified voters belonging to such party, may, for the state or municipality, or any lawfully organized portion of either, for which such convention, primary election or caucus is held, nominate one person for each office that is to be filled therein at the next ensuing election, and, subject to the provisions of this act, file a certificate of such nominations so made."

In his brief the defendant says:

"While it is provided by section 1 [Gen. Stat. 1901, § 2696] that a local political party may make party nominations, and under this law it might use the party name to designate its ticket, yet such ticket could only be placed on the official ballot by petition, and would not then be entitled to use either a party emblem or a circle. In other words, the law does not require official notice to be taken of such local political parties, and they are not entitled to the privileges which the law specifically gives to political parties having a state or national organization. A political party having only a local organization cannot file a certificate of nomination."

To this we cannot agree. It is true that section 2697 does not in terms refer to political parties having only a local organization, and its language taken alone might seem to exclude them. But this section must be read in connection with the preceding one, which is a part of the same act. The proviso of that section relating to local political parties plainly contemplates their making nominations for city officers by convention, primary election, or caucus, and using "party certificates of nomination." It must be taken to qualify the language of section 2697, and to make the terms "political parties," "party nominations," "party certificates," "party names" and kindred expressions wherever found in the act apply to local political parties as well as to those having a national or state or-

Ogg v. Glover.

ganization, so far as relates to city elections, except where the context forbids this construction.

Under the second specification noted the defendant contends that the findings made by the commissioner by whom the evidence has been taken show that the so-called "city ticket" was not nominated by any political party whatever, even by one having only a local organization. It appears that in former years there had been in Olathe a local organization known as the "citizens' party," which usually presented a ticket at the city election. This year the city central committees of . that party and of the republican party, in response to a suggestion made for the purpose of promoting harmony in municipal matters, united in calling a mass-meeting to nominate candidates for city offices. A meeting was held pursuant to this call, which was participated in by voters who were members of various political parties. At this meeting a full set of candidates for city offices was named, the plaintiff being nominated for mayor. It was then voted that the ticket thus formed should be designated as the "city ticket," and a committee was appointed to have general charge of the campaign. No resolutions were presented and no platform was adopted, but speeches were made, as disclosed by the evidence, to the effect that the purpose of the participants was to eliminate partizan politics from the city government. Previous to this time there had been no party in Olathe known as the "city party."

The contention of the defendant is that these considerations affirmatively establish that the ticket in question was not that of a political party within the meaning of the statute. Of the cases cited in support of this position several have but little, if any, relevancy, because they turn upon the conflicting claims of rival organizations to the use of the same party name. Two of them, however, namely, *Certificates of Nominations of McKinley-Citizens' Party*, 6 Pa. Dist. Rep. 109, and *Nomination of Jeffries, Nomination of*

*Rendall et al.*, 9 Pa. Dist. Rep. 663, contain expressions favoring the defendant's contention. In the syllabus of the former case it was said:

"A political party is a body of electors having distinctive aims and purposes, and united in opposition to other bodies of electors in the community within which it exists. A body of electors coming together for a single object, and with no continuity of aim or policy, is not authorized to file certificates of nomination, though it in fact polled at the last preceding election over two per cent. of the largest entire vote for any office cast in the state."

In the latter case the syllabus reads:

"There may be the prescribed number of votes cast at a preceding election to constitute the aggregation of voters a political party, but if the body does not also avow or proclaim a dogma or doctrine which invites support from the community at large, and not a section or fragment of it, and which is necessarily antagonistic to the tenets of recognized organizations or some of them, it cannot be a political party according to the legislative intent. And a party comes within this definition, and not entitled to a column on the official ballot, which is made up of several cooperating elements, which ordained no creed, adopted no platform, issued no declaration of principles, promulgated no fellowship of opinion or purpose in respect to public affairs, or in opposition to the well-defined principles of established parties, and to become a member of which no abnegation of faith nor absolution of allegiance from existing parties is required."

The force of these decisions as applied to the present question is at least seriously impaired by the provision of the Kansas statute, already discussed, giving merely local organizations a political status in city matters. But the essential doctrine upon which they are based has later been repudiated by the court of last resort in Pennsylvania. In *Independence Party Nomination*, 208 Pa. St. 108, 112, 57 Atl. 344, it was said:

"Every elector, as already said, has the right to express his individual will in his own way, and for his

own reasons, which are not open to question, however unsound and unimportant others may deem them. And the rights of electors acting together as a party are equally beyond question. The electors themselves are the only tribunal to decide whether the principles, platform, aim, or method of reaching the desired object, are broad enough, permanent enough or important enough to be the basis of united action as a party; and, if they so decide, courts must recognize and treat them accordingly. . . . What the bond shall be which holds the combination together is exclusively within its own determination. It may be different principles from those of other political parties, a different object, or the same object by different means. These and all similar matters are outside the jurisdiction of the courts and rest exclusively on the will of the individual electors. The objection, therefore, made in the court below that the independence party claim to be still democrats on national issues is not one with which the court has any concern."

To the same general effect see *Davidson v. Hanson,* 87 Minn. 211, 92 N. W. 93; *Baker v. Scott,* 4 Idaho, 596, 43 Pac. 76; *Roller v. Truesdale,* 26 Ohio St. 586.

Our statute formerly required that for a political party to be recognized as such it must have cast not less than five per cent. of the total vote at the preceding election. But the section containing this provision (Laws 1897, ch. 129, § 4) was repealed, and replaced by section 2 of chapter 177 of the Laws of 1901 (Gen. Stat. 1901, § 2697), which omits this requirement. The fact that the collection of voters calling themselves the "city party" had not previously cooperated in politics was, therefore, not fatal to their pretensions to a place upon the official ballot. It can hardly be thought that the common purpose by which they were actuated might not be indicated by the character of the speeches made at their meeting, or by other means, even although no formal platform was adopted. The doctrine that partizan politics should be kept out of the city government—that is, that voters in city matters should not align themselves in accordance

with their beliefs upon questions affecting the administration of state and national affairs—appears to be a sufficient basis for the union of voters favoring that theory; and no reason is apparent under our statute why they might not acquire by organization the right to be classed as a political party in matters relating to city elections. But the questions thus suggested need not be decided. We prefer to rest the determination of this matter upon another ground. Section 2703 of the General Statutes of 1901 provides:

"The certificate of nomination and nomination papers being so filed, and being in apparent conformity with this act, shall be deemed to be valid, unless objection thereto is duly made in writing within three days from the date said papers are filed with the proper officers. . . . Objections or questions arising in the case of nominations for city or incorporated town officers shall be considered by the mayor and clerk, with whom one councilman, chosen by a majority of the councilmen, shall act; and the decision of a majority of such officers shall be final."

In this case a certificate of nomination was filed with the city clerk purporting to be that of a political party called the "city party." Whether such a party really existed, and whether it was entitled to have its ticket appear upon the official ballot under that head and in connection with a circle by means of which an elector could indicate his choice for all the names thereon by making a single cross, were questions of fact that obviously might have been raised by objections duly filed and heard and decided by the tribunal provided by law for that purpose. No exception to the certificate having been taken before the election, by the method for which the law makes express provision, it is too late after the votes have been cast to take advantage of any such defect as that here alleged by an objection to the counting of the ballots. Under similar statutes the authorities are substantially unanimous in upholding this position. (See 15 Cyc. 339, 340, and cases cited, especially in note 74;

*Blackmer v. Hildreth,* 181 Mass. 29, 63 N. E. 14; *Earl
v. Lewis,* 28 Utah, 116, 77 Pac. 237.)

Upon this branch of the case it remains only to consider the effect of the omission of a party emblem
from the ballot. In section 2699 of the General Statutes of 1901 it is provided that "party certificates of
nomination shall contain and show, by a representation
thereof, some simple device or emblem to designate
and distinguish the candidates of the political party
making the nominations." In this case the certificate
of nomination failed to show a party emblem, and consequently none was printed upon the ticket. It may
well be argued that this defect was waived by the
failure to make timely objection to the certificate, inasmuch as it originated there, although it showed upon
the face of the document, which, therefore, was not
fully in "apparent conformity" with the statute. In
*Allen v. Burrow,* 69 Kan. 812, 818, 77 Pac. 555, the
tribunal created to consider objections to certificates
of nomination was said to be competent to pass upon
a question of the form of a certificate. In *Blackmer
v. Hildreth,* 181 Mass. 29, and *Earl v. Lewis,* 28 Utah,
116, under statutes similar to ours, it was said that
even the failure to file the certificate within the time
limit fixed by law is a matter for the consideration of
such tribunal.

But we do not care to place the decision of this matter upon such narrow ground. In *Boyd v. Mills,* 53
Kan. 594, 37 Pac. 16, 25 L. R. A. 486, 42 Am. St. Rep.
306, it was held that where the colored sample ballots
were by mistake used for voting by all the voters at
one polling-place the ballots should nevertheless be
counted. The present case is within the spirit of that
decision. It is true that there has been a change in
the phraseology of the law since that opinion was
written. The statute then read: "None but ballots
provided in accordance with the provisions of this act
shall be counted." (Laws 1893, ch. 78, § 25.) This
has been held to mean that the voters may not use

ballots of their own choosing, but only those furnished to them by the proper officials. (*State of Iowa v. Bernholtz et al.,* 106 Iowa, 157, 76 N. W. 662.) The corresponding part of our present statute reads: "No ballots other than those provided, printed and indorsed in accordance with the provisions of this act shall be delivered to a voter, deposited in the ballot-box, or counted." (Laws 1901, ch. 177, § 11; Laws 1903, ch. 228, § 4; Laws 1905, ch. 222, § 3.) Just what change in the policy of the law was intended to be accomplished by the additional words employed in the later statute need not now be determined. It cannot reasonably be believed, however, that it was the intention of the legislature that any slight departure from the strict letter of the law in the preparation or printing of the ballots should disfranchise the voters of an entire community.

The courts of England and Australia have given a very technical construction to statutes of this character. The supreme court of Montana originally followed their lead in this respect, upon the principle that in adopting a foreign statute the legislature was to be deemed to have adopted also the interpretation already given it by the courts of the country from which it was borrowed. (*Price v. Lush,* 10 Mont. 61, 24 Pac. 749, 9 L. R. A. 467.) Later, however, yielding to the argument that restrictions upon the electoral franchise should be employed with more caution in this country than under other forms of government, the court disapproved this case, and after a very thorough review of the American decisions reached the conclusion that an election otherwise legally and fairly conducted was not to be invalidated by reason of an irregularity in the preparation of the ballot. (*Stackpole v. Hallahan,* 16 Mont. 40, 40 Pac. 80, 28 L. R. A. 502.) This is unquestionably in accordance with the great weight of authority in the United States. (See the cases already cited, especially *Blackmer v. Hildreth,* 181 Mass. 29, and *Earl v. Lewis,* 28 Utah, 116.)

Ogg v. Glover.

The purpose of placing a party emblem upon the official ballot is obviously to enable the adherents of the party quickly, easily and surely to identify the ticket. The omission of the emblem from the "city ticket," under the circumstances here present, could not possibly have worked any prejudice to its opponents. (*Jones v. State, ex rel.*, 153 Ind. 440, 55 N. E. 229.) Such omission, however important it might have been if pointed out upon an objection to the certificate of nomination, affords no ground for rejecting the ballots cast at the election.

A question preliminary to the examination of the 204 ballots which are protested for special reasons is raised by the defendant. After the election returns had been opened and examined before the commissioner, these particular ballots were separated from the others, classified, and by the consent of both parties transmitted to this court by the commissioner for the purpose of enabling them to be used upon the hearing of the case, it being found impracticable to write such a description of them as would exhibit the precise character of their markings. They came into the custody of the clerk of this court unsealed, and were by him placed in that condition among the papers in the case. Later the plaintiff's attorneys obtained these ballots from the clerk, took them to a table in the clerk's office, and there spent some time in their examination.

The defendant claims that these ballots, from having been for a considerable interval in the hands of persons having an interest in the litigation, have lost their character as evidence and should be ignored. The argument is made that the legislature has been at great pains to prevent the possibility of any tampering with the returns of an election, especially by providing that the ballots shall be opened only in the event of a contest, and then in open court, or in an open session of the body trying the contest, and in the presence of

the officer in whose custody they are (Laws 1903, ch. 228, § 4) ; that these precautions are rendered wholly unavailing if, after the ballots are opened, they may be placed on file in a public office unsealed, and there handled by interested persons without official supervision. The fallacy of this reasoning is apparent. It is obvious that until the ballots are opened, examined and counted it is imperative that the greatest care possible be taken to guard against any opportunity for changing them. But when they have been once subjected to a critical inspection, and especially when they have become a part of the records of a court, there is ordinarily no longer the same reason for extreme precaution in that regard, for, their contents having become known with certainty, there is less room for the suspicion of any subsequent alteration, and their very character as part of the court files is a protection. In the present case, if it had seemed to the commissioner to be desirable, or if either party had requested it, the particular ballots in controversy might properly have been resealed until such time as this court should reopen them. But since that was not done, and the ballots were treated like any other documents on file with the clerk, there was no impropriety whatever in the conduct of the plaintiff's attorneys already related.

It is urged that in handling these ballots pencil-marks might have been made by accident or design, slight in themselves, but sufficient to vitiate a number of votes. This might be some reason for the ballots' having been placed under seal, but it is no reason whatever for presuming, in the absence of all proof, that any such marks were in fact made. Papers of the highest importance, any change in which might involve the gravest consequences, are habitually taken from the court files by attorneys, by the consent of the clerk, and kept in their possession for days at a time, with every opportunity for alteration. It has never been suggested that in such cases the authen-

ticity of the documents is discredited, or that a presumption of fraud on the part of an attorney arises from the most ample opportunity for its exercise.

In this connection it is necessary to notice language in the defendant's brief to which objection is made. It is said in the brief that the plaintiff's attorneys "not only had the opportunity of tampering with the ballots, but actually did so." If by this it was intended to charge that the ballots were in any way changed by the plaintiff's attorneys, the statement would warrant striking the brief from the files, for there is no shadow of evidence to support such an assertion, and such an attack upon opposing counsel should not be permitted to pass unnoticed. But it was explained in the oral argument by the defendant's attorneys that they used the expression "to tamper" as an equivalent for the phrase "to handle without lawful authority," and the context seems to be consistent with such use of the objectionable phrase in the present instance. This explanation doubtless brings the words quoted within the scope of permissible argument.

But on the next page of the defendant's brief an expression is used, the purport of which need not be here given, to which the court is unable to attach any meaning whatever that does not involve a gratuitous reflection upon the personal character of two of the plaintiff's attorneys. Attention was called to this language in the oral argument, and no offer has been made to qualify it or to show that it is capable of any construction other than that suggested. If it was so intended, the defendant's attorneys by its use forfeited all right to have their brief considered. (*Stager v. Harrington,* 27 Kan. 414; 3 Encyc. Pl. & Pr. 723, 724.) To have struck the brief from the files and given time for presenting another would have caused delay and inconvenience, and to have ignored it altogether would have deprived the court of the benefit of its contents in solving the disputed questions of law involved. It has therefore been made use of in its present form, but,

unless the expression referred to is voluntarily withdrawn or satisfactorily explained, it will by order of the court be erased from the copies of the brief that will remain a part of the public records. It should be added that three of the defendant's attorneys, A. Smith Devenney, C. L. Randall, and I. O. Pickering, have filed written disclaimers of any purpose on their part to question the integrity of opposing counsel.

The 204 doubtful ballots have been examined, and those to which no valid objection appears have been counted. Some of the ballots accepted by the election boards have been rejected here, and in a smaller number of cases ballots which the boards classed as void on account of defective marking have been held to be sufficient. In this recanvass, wherever the voter has apparently attempted in good faith to comply with the statute by making simple cross-marks in the proper squares, effect has been given to his intention as so expressed, even although some departure from symmetry and regularity is shown; for instance, where a pencil-mark is made double for a part of its length, or for all of it, in an evident attempt to make it plainer, or where accidental hooks or curves appear at the ends of the lines, caused by carelessness in removing the pencil. Irregularities of this character, being incapable of accurate description, and not being adapted to use as a means for the subsequent identification of the ballot, are not considered destructive of the voter's purpose.

Ballots have been rejected for the following causes: (1) The use of a blue or purple pencil in marking. (2) The placing in any square of a cross one of the arms of which is distinctly and purposely paralleled by a third line, forming such a figure as this: ⊠ (*Wheeler v. Caldwell*, 68 Kan. 776, 74 Pac. 1031.) (3) The placing in any square or circle of a distinct third line in addition to the two forming the cross, although not parallel to either, forming such a figure as

this : ⊠  (4) The placing in any square or circle of a single line, not crossed by another.  (5) The placing in any square or circle of a nondescript character which shows no attempt at forming a simple cross. (6) The placing of a cross outside of any square or circle.  (7) The placing of a cross in a square in the blank column opposite which no name is written.  (8) The defacing of the ticket by apparent attempts at erasing marks already made.  (9) The placing of a cross in the circle and also a cross in one of the squares in the same column but not in all of them. (10) The placing of a cross in the circle and also a cross in a square of some other column.  (11) The placing of crosses in the squares opposite the names of two candidates for the same office.  (12) The writing in the blank column of a name which is already printed on the ballot as that of a candidate for the office indicated.  (13) The writing of a name in the blank column without placing a cross in the corresponding square.  (14) The writing of a name on the ballot elsewhere than in the blank column.  (The law in respect to Nos. 9, 10 and 11 has been changed by chapter 222 of the Laws of 1905.)

For a collection of recent cases upon the defective markings of ballots under the Australian-ballot law, see volume 15 of the Cyclopedia of Law and Procedure, pages 352-362.

A recount of these ballots in connection with those to which no exception is taken, conducted under the rules indicated, gives the plaintiff 595 votes and the defendant 576.  Judgment is accordingly rendered for the plaintiff.

All the Justices concurring.