ARTHUR CAPPER, *Plaintiff*, V. C. C. STOTLER, as County
  Clerk of Wabaunsee County, et al., *Defendants.*

No. 18,503.

SYLLABUS BY THE COURT.

MANDAMUS—*Election—County Canvassing Board—Adjournment
  Sine Die—Non Est.* After the county board of canvassers
  has in good faith completely and correctly canvassed the re-
  turns of an election, which are regular on their face, and
  adjourned *sine die,* the members of an election board can not
  be compelled to reconvene and count ballots for a state office
  which they have erroneously rejected and returned as void,
  for the reason that under such circumstances the county can-
  vassing board has passed out of existence and can not be re-
  vived by its own action or by that of a court.

Original proceeding in mandamus. Opinion filed
December 7, 1912. Motion to quash alternative writ
sustained.

*Fred S. Jackson,* of Eureka, *Robert Stone, George T.
McDermott,* and *Eugene S. Quinton,* all of Topeka, for
. the plaintiff.

*Oscar Schmitz,* of Alma, for the Board of County
Commissioners.

*Ferry, Doran & Dean,* and *A. M. Harvey,* all of To--
peka, *H. S. Martin,* of Marion, and *Hugh T. Farrelly,*
of Chanute, for C. C. Stotler *et al.*

The opinion of the court was delivered by

MASON, J.: Arthur Capper, the candidate for gov-
enor upon the republican ticket at the election held
November 5, 1912, brings mandamus in this court
for the purpose of causing to be counted and canvassed
certain ballots cast for that office, which were in fact
valid, but which the election board failed to count and
returned as void. The ballots referred to are those
upon which the voter indicated his preference by plac-
ing a cross in the circle at the head of a party ticket,

and also by placing crosses in the squares opposite the names of other candidates on the same ticket for whom he desired to vote. This is a manner of marking the ballot which under a former wording of the statute required its rejection. (*Ogg v. Glover,* 72 Kan. 247, 261, 83 Pac. 1039.) In 1905 the law was so amended as specifically to require the counting of ballots marked in that manner, the provisions on the subject reading:

. "If the voter perfers not to vote a straight party ticket, he may make a cross-mark in the circle and then make a cross-mark in the square to the right of the names of such other candidates as he may wish to vote for, found under *the same* or any other party name or independent nomination." (Gen. Stat. 1909, § 3270.)

"When a voter has properly marked his ballot in the circle at the head of the ticket, the marking of the names by a proper cross-mark in all or a part of the squares to the right of the names on the same party ticket shall not prevent the counting of such ballot." (Gen. Stat. 1909, § 3273.)

An alternative writ of mandamus has been issued reciting that ten or more ballots of the character indicated were cast in Rock Creek precinct of Wabaunsee county; that the election board failed to count them, but returned them with other rejected ballots in a sealed envelope endorsed as containing void ballots; that the county board canvassed the returns without said ten or more ballots having been counted; and that an abstract of the returns for that county was forwarded to the secretary of state, in which no account was taken of such ballots. The relief sought is that the returns of the election be restored to the election board; that that board be required to count the ballots referred to and amend their returns accordingly; that the amended returns be canvassed by the county board; and that the result be shown in a corrected abstract to be sent to the secretary of state. That such orders might be made effective the township trustee, the county commissioners, and the county clerk, as well

as the members of the election board, have been made defendants. The members of the state board of canvassers have also been made parties, in order that their canvass might not be completed before the determination of the questions here invoked, a restraining order having been issued to prevent that result. A motion to quash the alternative writ has been filed in the name of the defendants by attorneys representing the opposing candidate for governor, George H. Hodges. A number of applications of a similar nature, arising in like circumstances in other precincts and counties, have been presented, action upon which has been deferred pending the decision of the motion to quash. They involve approximately 124 ballots, and the preparation of papers in other cases has been suspended to await the action of the court in this. It is stated that the total number of such ballots rejected in various parts of the state is from two to three thousand.

An objection is made to the issuance of a peremptory writ ordering the counting of these ballots upon the ground that the duty of the election officers in respect thereto is quasi-judicial in its nature and can not be controlled by mandamus. Upon this question there is a conflict in the decisions. It can not be said with accuracy that the judges of election have any *discretion* to count or to reject any particular ballot. It is their absolute duty to count the legal ballots and to reject the illegal. It is true, however, that the statute entrusts to them the function of deciding in the first instance whether a ballot is legal or illegal. The law says that the marking of a ballot in the circle at the head of a party ticket, and also in some of the squares opposite the names of individual candidates on the same ticket shall not prevent its being counted. This, however, is but one of a number of rules for determining what ballots shall be counted and what rejected. A ballot marked in a particular way is neces-

sarily either void or valid, and should be counted or rejected according to the statutory rules. But the interpretation and application of these rules calls for the exercise of judgment, and may give rise to a difference of opinion even among those highly trained in the solution of such problems, as is illustrated in *Parker v. Hughes*, 64 Kan. 216, 67 Pac. 637, 56 L. R. A. 275, 91 Am. St. Rep. 216. Experience has shown that in every election and in almost every precinct ballots will be so marked as to raise serious question as to their validity. In a contest over the election of a mayor of Olathe, in addition to objections made to certain classes of ballots, over two hundred ballots were challenged for various special reasons, and in passing upon their validity this court announced fourteen separate rules. (*Ogg v. Glover*, 72 Kan. 247, 260, 261, 83 Pac. 1039.) The election judges are required to examine and consider every ballot cast; to ascertain whether it is entitled to be counted; if it is found to be valid, to enter it in favor of the candidates for whom it is cast, and if it proves to be void or blank to count it as void or blank and return it in a separate sealed pouch with others of like character. There is a reasonable ground for the contention that the laws of this state contemplate that the result of an election shall be determined and declared in the first instance upon the face of the returns of the election boards, made upon their judgment of the validity of the ballots, whether right or wrong, leaving their errors in that respect, if any, to be corrected by proceedings subsequently brought. This view would not necessarily prevent the control of the action of the election board by mandamus with respect to purely clerical matters, such as a mistake in addition; or whether they had acted in bad faith; or had assumed to reject votes for a certain candidate because they regarded him as ineligible; or where they refused to accept the votes of a class of electors upon a mistaken view that they were not entitled to vote

upon the particular question involved; or where they declined to receive, file and return a ballot which, whether counted or not, should be made a part of the record so as to preserve for review the question of its validity. This theory of the matter is thus expressed in *People v. Hanes,* 44 Misc. Rep. 475, 90 N. Y. Supp. 61:

"Inspectors of election have both judicial and ministerial duties to perform. In determining what ballots shall be counted for or against any candidate, or any question voted on, or what ballots shall be rejected, they act judicially. They may, perhaps, be required by mandamus to perform merely ministerial acts in a particular way, and they may also be required to exercise their judicial functions; but they can not be required by a common-law mandamus to decide in a particular manner. . . . It is the performance of a judicial act on the part of the inspectors which is complained of in this case; not the failure on their part to act judicially, but the judicial conclusion reached by them; and it is this judicial conclusion which it is sought to have changed. The inspectors have performed the judicial act complained of. They may not have reached a correct conclusion, but they have acted and exercised their judgment, and the conclusion reached by them can not be reviewed herein." (pp. 62, 63.)

While this expression is not that of the New York court of last resort, it seems to be supported by various decisions of that tribunal. (*People ex rel. Brink v. Way,* 179 N. Y. 174, 71 N. E. 756; *Matter of Hearst v. Woelper,* 183 N. Y. 274, 76 N. E. 28.) There is some apparent conflict in the decisions of that state, which may in part be accounted for by the fact that the statute provides for a judicial review of the action of the election officers in certain circumstances. The latest case on the subject seems to qualify if it does not in effect overrule the statements quoted. It turns to some extent, however, upon special features of the statute. The New York law does not entrust to the

election board the duty of determining whether or not ballots "protested as marked for identification" shall be counted. The board is required to count all such ballots, but to return them in a separate envelope. (2 Consol. Laws of New York, 1909, ch. 17, art. 14, § 370.) A candidate may have a writ of mandamus to the board of canvassers (if any, otherwise to the election board itself) to compel the rejection of such of these ballots as the court determines to have been marked for the purposes of identification. (2 Consol. Laws of New York, 1909, ch. 17, art. 14, § 381.) Under that system it was held that where the election board failed to count the challenged ballots they could be compelled to do so by an ordinary action of mandamus, leaving the question whether any of them should be rejected to be determined in the manner described. (*People ex rel. McLaughlin v. Ammenwerth,* 197 N. Y. 340, 90 N. E. 973.)

In several states statutes have been enacted expressly permitting a judicial or other review of the action of election officers prior to the completing of the canvass. (10 A. & E. Encycl. of L. 751; Note, 98 Am. St. Rep. 863, 888.) The case of *Territory ex rel. v. Suddith et al.,* 15 N. Mex. 728, 110 Pac. 1038, supports the right to control by mandamus the action of the election board in rejecting or counting ballots, in the absence of a special statute. The following cases are thought to have some tendency in the same direction: *Flanders v. Roberts,* 182 Mass. 524, 65 N. E. 902; *Brewster v. Sherman,* 195 Mass. 222, 80 N. E. 821; *Bennett v. Richards,* (Ky.) 83 S. W. 154. These cases are regarded as having a tendency to the contrary: *State ex rel. Lilienthal v. W. T. Deane et al.,* 23 Fla. 121, 1 South. 698, 11 Am. St. Rep. 342; *State, ex rel. Waggoner, v. Russell,* 34 Neb. 116, 51 N. W. 465, 33 Am. St. Rep. 625, 15 L. R. A. 740.

There is more or less difference in the statutes under which these cases have been decided, so that a fuller

discussion of them would not aid greatly in interpreting our own statute. Moreover, it is not necessary at this time to decide the broad question which has so far been considered, for the reason that a special aspect of it is here presented. Whether or not mandamus will lie to require an election board to reconvene for the purpose of changing its rulings upon the counting or rejection of ballots, such action can not be brought after the county board of canvassers has in good faith completed a correct canvass of the returns as made, and adjourned *sine die*. In the opinion of the court this conclusion necessarily results from the doctrine announced in *Rosenthal v. State Board of Canvassers*, 50 Kan. 129, 32 Pac. 129, 19 L. R. A. 157. In 1892 Joseph Rosenthal was the democratic candidate for member of the state house of representatives for the district composed of Haskell county. He received a majority of the votes cast and the county board of canvassers declared the result accordingly. There was no controversy over the fact, but the county clerk, in certifying to the state board of canvassers, "by accident or design, probably by gross negligence" (p. 131), transposed the figures, giving Rosenthal credit for the vote cast for his opponent and *vice versa*. The state board, having before them this official certificate, which was apparently regular in all respects, declared the result in accordance therewith, and on December 1, 1892, adjourned *sine die*. In consequence a certificate of election was issued to the defeated republican candidate. On December 19 a new certificate from the county clerk, showing the vote as it actually stood, was furnished to the secretary of state. On December 23 Rosenthal began mandamus proceedings in this court against the members of the state board of canvassers, seeking to compel them to reconvene and declare him elected. On the same day an alternative writ was issued, returnable January 3, 1893. An answer was filed setting out substantially the facts stated.

It would be difficult to imagine a controversy growing out of an election where the substantial rights of the parties were clearer, or where it was more manifest that the practical effect of intervention by the court would be to do justice and prevent the infliction of a gross wrong under the forms of law. The right to a clear title upon the face of the returns, as distinguished from the right to gain possession of the office by a contest, was a material one, and was of especial importance because it was known that the newly elected house of representatives was divided so evenly upon political lines that the change of a single vote might be sufficient to shift its control from one party to another. And in fact at the ensuing session, beginning January 10, 1893, two separate bodies were organized, each claiming to be the legal house of representatives, both of which transacted business as such until the decision of this court that those who had been officially declared elected to membership in the house, and no others, were entitled to participate in its organization. (*In re Gunn, Petitioner*, 50 Kan. 155, 32 Pac. 470, 948, 19 L. R. A. 519.) The state canvassing board, misled by the untrue certificate of the county clerk, had innocently conferred upon a person having not even a pretense of right thereto the power to take part in the organization of the legislature, and thereby possibly change its political complexion and profoundly affect the results of the session. In that situation the court was appealed to to right the unquestioned wrong that had been done. No case could make a stronger appeal for the granting of a writ of mandamus to compel the recanvass of election returns, if the authority for it existed. The court recognized this, but withheld its hand because it found it could not, "properly and in accordance with legal principles" (p. 137), afford a remedy. The grounds of the

·decision were thus stated in the opinion, filed January 7, 1893:

"If a person, upon the face of the returns, is entitled to the certificate of his election, except in special instances, where wrong or injustice will be done, the courts have power to reach the officers composing the delinquent board by writ of *mandamus* and compel them to action,· and, if necessary, may compel them to reconvene and recanvass.    Therefore, if there was nothing in this case but the question of jurisdiction of this court, the plaintiff would be entitled to the relief claimed by him.    But it appears in this case, from the records of the board of state canvassers, that the board, on December 1, 1892, long before what purported to be corrected returns from Haskell county· were filed with the secretary of state, had completed its labors, declared the result against the plaintiff, and finally adjourned.    . . · .    If the board of state can-vassers had discharged all of its duties which the law especially enjoined upon it, before its final adjournment on the 1st day of December, 1892, then no writ of *mandamus* can issue, because there would be the ·performance of no duty to enforce.    . . .    If a canvassing board, having concluded its labors and finally adjourned, has no power or authority to reconvene and recount, the courts, under the provisions of the statute, can not by *mandamus* compel the board to reassemble or give it any power so to do.    It is, however, contended upon the part of Rosenthal, that as the statute requires the county clerk of Haskell county to make out an abstract of the votes for representative, and, after having been signed and certified to by him, to deliver the same by mail to the secretary of state, and as the ·first returns were not true, because they incorrectly stated the votes of each of the candidates, no valid abstract was received from Haskell county prior to De-·cember 19, 1892, and therefore, as no true abstract or returns were received, this court may compel the board of state canvassers to reassemble and complete its work by canvassing the later (or supplemental) re-turns·.    If no abstract from Haskell county had been received by the secretary of state before the final adjournment of the board, on December 1, 1892, and if the state board had had no abstract of· returns before

it from Haskell county to act upon, it is possible that, under the decision of *Lewis v. Comm'rs of Marshall Co.*, 16 Kan. 102, *mandamus* would lie, upon the ground that only a partial canvass had been made. But that is not this case. An abstract of the votes for a member of the house of representatives, signed and certified by the county clerk, properly indorsed and directed to the secretary of state, was received by him and placed before the state board of canvassers during its proceedings in November. That abstract was incorrect, but it came from the proper officer; it was signed and certified by the proper officer. It was duly authenticated. It was not challenged or objected to. The members of the state board of canvassers had no notice or knowledge, at the time they were considering it, that it was incorrect or defective. Upon the face of the returns, they appeared to be in full compliance with the provisions of the statute. There was nothing in the returns, or in the manner in which they were transmitted or received, to cause suspicion, or to demand any other action thereon than usual and customary in such cases. The state board accepted the returns as truthful, passed upon them as such, and declared the result therefrom. It is well settled that the duties of the canvassing officers are purely ministerial, and extend only to the counting up of the votes, and awarding the certificate to the person having the highest number. They have no judicial power. . . . Considering all the facts and circumstances of this case presented upon the trial, as no fraud, wrong or other official misconduct is imputed to the members of the state board of canvassers, or either of them, in receiving and counting the returns complained of, we must hold that they did not improperly reject any returns, or refuse to canvass any returns. When the board adjourned on the 1st day of December, 1892, the members thereof had fully discharged all of their duties; and it is too late now to say that they can voluntarily, or by compulsion, meet again as canvassers, to examine and pass upon the returns of the election of November, 1892. As a body, the board of state canvassers is *functus officio*—officially dead. It has no power of resurrection so as to consider the returns of the election of November, 1892, and this court can not animate its dead body with the breath of life." (*Rosenthal v. State Board of Can-*

*vassers,* 50 Kan. 129, 133-136, 32 Pac. 129, 19 L. R. A. 157.)

We conceive the essential purport of this decision to be that where a canvassing board has in good faith completed its work in a proper manner so far as its own conduct is concerned, and finally adjourned, it has in the eye of the law passed out of existence, and can neither convene again of its own accord, nor be brought together by the order of the court, for the purpose of giving effect to the subsequent correction of a latent mistake in the returns submitted to it. This rule applies to the position of the county canvassing board of Wabaunsee county in the case at hand. Under our statute the election board makes returns to the county clerk. The clerk and the county commissioners, from the poll books and tally sheets, ascertain the result of the vote in that county, upon state and district as well as upon local officers; they "determine the persons who have received the greatest number of votes in the county" (Gen. Stat. 1909, § 3137), and sign abstracts showing the vote upon each office. The county clerk mails to the secretary of state copies of the abstracts of the vote of his county upon state and district officers. The state board of canvassers compiles the total vote from the abstracts from the different counties. (Gen Stat. 1909, §§ 3136, 3137, 3140, 3146.) Here the county board, at the time appointed by law, properly canvassed the election returns from the various precincts, and declared a result. It neglected no duty. It did what the law commanded to be done, and what in the event of a refusal a court would have compelled. Its action was as complete with respect to state officers as to those of the county. It declared the result of the vote of that county upon the office of governor. The result of its action has been communicated to the secretary of state by the forwarding of an abstract. The county canvassing board has gone out of existence and can neither reconvene on its own motion

nor be required to meet by the order of a court. Without a county canvassing board to give effect to any changes that might be made by the election boards in their returns there is no machinery available for the purpose.

It is suggested that the present case may be distinguished on the ground that here no certificate of election has as yet been issued. We are unable to see that the doctrine of the Rosenthal case is affected by that consideration, or that it plays any part in the reasoning by which the conclusion was there reached. The decision was based upon the fact that the board itself had completed its work. The essential act of the board was the declaration of the result. The issuance of a certificate followed from that, as evidence of it. If the certificate had been issued to the wrong person because of an error made by the state board or by the secretary of state, the fact that it was outstanding could not have prevented a correction of the mistake, even although their terms of office had in the meantime expired. (*Shull v. Comm'rs of Gray Co.,* 54 Kan. 101, 107, 37 Pac. 994.) A certificate of election without a declaration of the canvassing board back of it would be of no legal and of little practical effect; it would be entitled to no respect and would command none from those advised of the facts. The correction of an inadvertent canvass would of itself discredit any outstanding certificate and in substance effect its cancellation.

If the court should be asked to reconvene the county canvassers to correct an error of the election board with respect to a county office, an obviously conclusive answer would be that the county board no longer exists. As it has completed its duty with respect to returns on state offices precisely the same as with respect to county offices, it has passed out of existence for one purpose just as it has for the other. The abstract of votes for a state office sent to the secretary of

state corresponds perfectly to the certificate of election in the case of a county office.

The theory is advanced that the entire machinery for the canvass of the vote on a state office should be regarded as a unit, and that until the certificate of election has been issued the entire matter of the revision of the returns should be regarded as still open. This idea of unity, however, is inconsistent with the doctrine of the Rosenthal case. If the several officers acting in the matter are to be regarded as a unit, then the wrongful act of the county clerk in sending in a false certificate could be imputed to the entire body of which he is a member, and it would have to be said that the organization as a whole had not done its full duty. The result in the Rosenthal case was reached by treating the state board of canvassers as completely severed from the county officers, so that by accepting the false certificate and adjourning, it made it impossible for the mischief to be remedied. Although the actual result reached by the board was a wrong one, it was held to have fully and correctly performed the duty for which it was created, not because it happened to be the latest body to act upon the matter, but because it was an independent one, responsible only for its own conduct, and not subject to be reconvened to aid in correcting the mistakes of some other officer: The work of the state board, considered as a separate body, had been completed, for it had correctly acted upon what was before it. But the work of all the officers concerned in the canvass, taken collectively, was not completed, for no true abstract of the vote of Haskell county had been made or canvassed. If in that case the county clerk had refused to make a corrected certificate, he could, of course, have been compelled to do so, except for the fact that it would have been unavailing, as there was no state board to consider it. So here any correction of the returns of the election board

would be unavailing, as there is no longer a county board to consider them.

In the Rosenthal case it appears that no formal demand was made upon the state board of canvassers to reconvene, and that Rosenthal had served a notice of contest upon the holder of the certificate of election. To whatever consideration these matters may have been entitled, it is sufficient for present purposes to say that the decision was in no way based upon them.

The alternative writ contains an allegation that the county board, at the time of the canvass, had notice and knowledge that a large number of properly marked ballots had not been counted. It was conceded at the argument, however, that there was nothing upon the face of the returns made by the election board that showed any irregularity, beyond the fact that the number of ballots rejected (about ten per cent of the whole) was so large as to give rise to suspicion. The county board would have no warrant for saying that the rejection of ten per cent of the ballots cast afforded a presumption of wrongful action by the election officers, and that fact would not have justified it in refusing to complete the canvass. It was admitted that the county board had no actual knowledge of the matters complained of, but it was said that it was "in the air" that such errors had been committed. A mere rumor could not give a basis for a refusal to canvass returns regular on their face. In the Rosenthal case, before the meeting of the state canvassing board the result of the vote had been repeatedly published, and it was a matter of common knowledge, controverted by no one, that Rosenthal had been elected. If constructive knowledge were to be regarded, it might have been said that the board was affected by it in that case. The board's want of notice was there mentioned as affecting the question of good faith, and the absence of "fraud, wrong or other official misconduct." (*Rosenthal v. State Board of Canvassers,* 50 Kan. 129, 136,

32 Pac. 129, 19 L. R. A. 157.)  In that connection only actual notice could be important.

The doctrine invoked may seem harsh and ill suited to the practical attainment of just results.  It is certainly rigid and inelastic; but the decision referred to declared the rule that a canvassing board after final adjournment can not be reconvened to correct the error of some other officer, to be a part of our election law, having substantially the force of a statute; it has stood for twenty years; it must be deemed to have been acquiesced in by the legislature, since the rule has not been changed by statute; and it must now be regarded not as merely advisory, but absolutely controlling.  Moreover, there is much to be said for the proposition that while the rule may work a hardship in a particular case, in the long run it perhaps serves a good practical purpose in preventing confusion and complication.  The reasons advanced for directing a correction of the returns of the election boards now called in question would apply with equal force in every precinct where a single ballot has been wrongly counted.  In a total vote of over 359,000 the majority of the democratic candidate for governor, in the present state of the canvass, is 26.  Changes in a single precinct in any part of the state might throw the result one way or the other.  An attempt to correct by mandamus all errors in the original returns before the issuance of a certificate would be beset with grave practical difficulties.  That, however, would not justify a refusal to enter upon the work if the power to do so existed.  Whatever might be the effect in this particular case, the practice advocated by the plaintiff would, in its general application, be fraught with obvious peril. If the election boards can now be compelled by mandamus to reconvene and revise their returns, they can do it of their own motion. ´ (26 Cyc. 165, 166.)  If they can correct errors in the rejection of one class

26—88 KAN

of ballots, they can also correct errors in the rejection of others and in the counting of ballots that ought to have been rejected. If they can lawfully require the return to them of the ballots, upon a showing that a mistake has been made, it would seem that they can require it upon their own knowledge of the fact, and perhaps upon their own assertion of it. A majority of them might be authorized to act, under the rule that statutory authority given to three or more public officers may be exercised by a majority of them, unless it be otherwise expressed. (Gen. Stat. 1909, § 9037, subdiv. 4.) Having the ballots in their possession, it would also seem that they could, and perhaps should, make an entire recount, accepting and rejecting ballots in the light of new knowledge that has come to them since the first returns were made. Without supervision by a court or other body the second return might in fact be no nearer correct than the first. Upon the suggestion of a newly discovered mistake the process might be repeated, and no definite limit to it could be set. And after the semiofficial returns of a statewide election have developed that the change of a few votes one way or the other might affect the general result, an inflamed partisanship might so warp the judgment of officers as to induce unjustifiable rulings in the new count. Additional recounts might be undertaken in a spirit of retaliation. Officers who would not deliberately violate their duty might be misled by passion. Alterations in the original returns, after it had been learned how much of a change would affect the result, although in fact made in good faith, would be viewed with suspicion and distrust. The command of the statute that the ballots cast at an election shall be opened only in open court or in the presence of the body trying a contest (Gen. Stat. 1909, § 3273) is not interpreted so literally as to forbid the opening of a pouch containing ballots in order to remove the poll books and tally sheets that have been placed there

through mistake (*Patten v. Florence, County Clerk,* 38 Kan. 501, 17 Pac. 174), but has been held to be mandatory (*Getty v. Holcomb,* 79 Kan. 224, 99 Pac. 218). It illustrates the legislative purpose that every precaution shall be taken to preserve the identity of the ballots and their authenticity as evidence. These considerations are suggested, not as grounds for the decision here rendered, but to show that the rule which we follow, and which we believe to have been heretofore adopted and to be already binding upon us, serves a good practical purpose in fixing a definite limit to the period within which an election board may undertake to change its returns.

The ballots marked in the manner described in the alternative writ are unquestionably valid. They are made so by express provision of the statute. Assuming the facts to be as contended by the plaintiff the circumstance that so many of them were rejected makes the failure to count them peculiarly unfortunate. They ought to have been counted. They ought still to be counted, if there were any legal method of accomplishing that result. But in the face of the objection made, the court is powerless to compel it. In the rejection of these ballots a great wrong has been done, for which the remedy by quo warranto or contest affords only a belated, and therefore a partial and inadequate remedy—a wrong not only to the candidates affected, but to the people of the state. But a greater wrong would be done if the court, for the purpose of promoting justice in this particular case, were itself to transgress its lawful bounds, and assume and exercise a power to which it is not legally entitled. We may not "wrest once the law to our authority," or "to do a great right do a little wrong."

The motion to quash the alternative writ is sustained.

WEST, J. (dissenting) : The court finds no reason

for refusing the writ save the Rosenthal decision. This is not the Rosenthal case. There all the canvassing boards had adjourned *sine die,* the certificate of election had been issued and the relief demanded was that the state board be required to reconvene, determine that another had been elected and issue to him a new certificate. It was said that if the board had discharged all of the duties which the law especially enjoined upon it, before its final adjournment, the writ could not issue; that there was nothing to cause suspicion or to demand any other action, and the returns had been accepted as truthful and passed upon as such, and the result declared therefrom.

Here the canvass as to state officers, beginning with the precinct and ending with the state board, had not been completed. The initial count being wrong, the error remained during the continuation of the work by the other boards whose action was required to complete the canvass and authorize a certificate. These boards were all in court and a duty was still unperformed. It was brought to their notice that a number of legal ballots had been rejected, the location and identification of which were beyond question or dispute. Concerning these ballots the election board had no judgment to exercise. The statute had made their ministerial duty absolutely plain. The provision concerning the preservation of the envelope containing them was not intended to and does not preclude a court of competent jurisdiction from compelling officers to follow the statute.

If, as the opinion states, the doctrine of the Rosenthal case "may seem harsh and ill suited to the practical attainment of just results" and is "rigid and inelastic" (*ante,* p. 401) then certainly it should not be stretched beyond its necessary application.

This court is by the constitution (Art. 3, § 3) vested with jurisdiction in mandamus and the legislature has only said that the writ may not be issued in any case

Capper v. Stotler.

"where there is a plain and adequate remedy in the ordinary course of the law" (Civ. Code, § 715). The remedy to be found in a contest or in quo warranto is confessedly not of that kind. Similar power has been exercised by other courts. (*O'Connell v. Mathews*, 177 Mass. 518, 59 N. E. 195; *Brewster v. Sherman*, 195 Mass. 222, 80 N. E. 821; *Territory ex rel. v. Suddith et al.*, 15 N. M. 728, 110 Pac. 1038; *People v. Beam*, 117 N. Y. Supr. Ct., App. Div., 374, 103 N. Y. Supp. 818; *Matter of Larkin*, 163 N. Y. 201, 57 N. E. 404; *People ex rel. McLaughlin v. Ammenwerth*, 197 N. Y. 340, 90 N. E. 973; *Sanderson v. Payne*, [N. Y. Supr. Ct.] 64 How. Pr. 357; 15 Cyc. 378.)

It is provided that failure to comply with the provisions of the law in noticing and conducting an election shall not preclude the one actually receiving the highest number of votes from receiving the certificate "so that the real will of the people may not be defeated by any informality of any officer." (Gen. Stat. 1909, § 3138.) Neither should it be defeated by the failure of an officer to count the ballots as the law directs.

Few rights are more sacred than the one to have an honest ballot properly counted. It is setting the hands of the clock backward to hold that such right can not be protected in this case.

I am authorized to state that Chief Justice Johnston concurs in this dissent.