No. 26,220.

JESSE D. WALL, *Plaintiff*, v. GROVER PIERPONT, *Defendant*.

SYLLABUS BY THE COURT.

1. ELECTIONS—*Ballots—Identifying Marks.* By virtue of section 7, chapter 189, Laws of 1913 (R. S. 25-420), which effected a distinct change in the law relating to invalidity of ballots exhibiting irregular marking within the square opposite the names of candidates, departures from the true cross consisting of one line, one other line, and one crossing of those lines at any angle, do not as a matter of law invalidate. The intent of the voter must first be considered, and if in the opinion of the judges the cross is not an identifying mark the ballot shall be counted.

2. SAME—*Identifying Marks—Application of Statute.* The section referred to applies to the cross mark within the square at the right of names of candidates, used for voting purposes, and is not applicable to marks or writings which under other sections of the statute it is not lawful to make, or which render the ballot void.

Original proceeding in quo warranto. Opinion filed October 10, 1925. Judgment for defendant.

*John S. Dean, Harry W. Colmery,* both of Topeka, *A. V. Roberts, Richard E. Bird, I. H. Stearns, John W. Blood, Ray Campbell* and *John B. Bryant,* all of Wichita, for the plaintiff.

*D. H. Branaman,* of Topeka, *A. L. Noble, George McGill, S. A. Buckland, Robert C. Foulston* and *George Siefkin,* all of Wichita, for the defendant.

The opinion of the court was delivered by

BURCH, J.: The action is one of quo warranto to determine the correct result of the election in Sedgwick county in November, 1924,

---

1. Elections, 20 C. J. § 194.  2. Id., 20 C. J. § 194.

to the office of judge of the district court of the eighteenth judicial district, third division.

Jesse D. Wall and Grover Pierpont were the opposing candidates and the certificate of election was issued to Pierpont. Plaintiff framed the issues to require, and prayed for, a count of all the ballots cast at the election. The court appointed J. V. Humphrey, of Junction City, commissioner to take the testimony and report findings of fact and conclusions of law. He did so, and the report of his masterly work is appended to this opinion. Plaintiff has excepted to the report. The exception to counting ballots imperfectly marked in the squares, referred to in findings 9 and 17, presents the principal subject of controversy. It appears that at the commencement of the commissioner's count both plaintiff and defendant interposed objections to counting ballots of the character described, which were overruled. Soon afterward defendant acquiesced in the commissioner's ruling, made no further objection to counting this class of ballots for plaintiff, and no record of the number so counted was kept. Defendant now stands upon the ground finally taken before the commissioner, and is willing to concede that if the classes of ballots referred to were wrongfully counted for him plaintiff was elected.

Previous to 1893 an election was held in this way: The state provided a place where persons might vote, a ballot box to contain the ballots, and election officials to receive and count the ballots and make return of the result. The voter brought and delivered to one of the judges a piece of paper on which was written or printed the names of the persons for whom he was voting, with designation of office. Section 29, chapter 36, General Statutes of 1868, which has continued to be and still is in force, reads as follows:

"In all elections for the choice of any officer, unless it is otherwise expressly provided, the person having the highest number of votes for any office shall be deemed to have been elected to that office; and whenever it shall satisfactorily appear that any person has received the highest number of votes for any office, such person shall receive the certificate of election, notwithstanding the provisions of law may not have been fully complied with in noticing and conducting the election, so that the real will of the people may not be defeated by any informality of any officer." (R. S. 25-702.)

In 1893 the Australian ballot law was enacted, the purpose of which was laudable in the highest degree. Voting, however, became a ceremonial conducted according to an elaborate ritual. The place

for holding the election was painstakingly oriented for the occasion. The conduct of the election officials and the successive movements of the voter within it were designated with precision. Official ballots were provided, the form of which was prescribed in great detail. None other could be used or counted, and the subject of marking the ballots received special attention. (Laws 1893, ch. 78, §§ 14, 22, 25 and 27.)

Following the first election held under the new law an action of quo warranto was instituted in this court to try title to an office. The law provided that official ballots should be printed on plain white paper. In one township colored sample ballots were supplied by the election officials to the voters, and the white official ballots were returned to the county clerk unused. In the opinion the court said:

"In considering the statute we are to keep steadily in mind the evident purpose of the legislature in its enactment. It is plain that among the most prominent ends sought to be attained was that of absolute secrecy. Any mark or distinguishing feature on the ballots which would enable a person other than the voter himself to identify the ballot, and find out how the elector had voted, was intended to be strictly prohibited.

. . . . . . . . . . . . . .

"We have examined the numerous cases cited by counsel for the plaintiff, and from them deduce two rules, which seem to be steadily adhered to by the courts: (1) That, under laws similar to our own, designed to preserve the secrecy of the ballot, any mark or distinguishing feature apparent on the ballot renders it void. (2) Where the law is explicit in prohibiting the counting of any ballot which does not conform to the requirements of the statute, that the courts will enforce the law as it reads without interposing their own judgment as to the reasonableness or unreasonableness of the requirements.

. . .

"We reach the conclusion that the law has not been substantially infringed, because we are unable to see how the purposes of the act can have been impaired in any degree by the mistake made in using the colored ballots. . . ." (*Boyd v. Mills*, 53 Kan. 594, 606, 607, 609, 37 Pac. 16.)

An election contest growing out of the first election held under the new law reached this court (*Taylor v. Bleakley*, 55 Kan. 1, 39 Pac. 1045). The contest court had counted ballots upon which cross marks appeared entirely outside of the voting squares. The law twice said voters should make the cross mark in the square, and said if the voter failed to mark his ballot as the law provided it should not be counted. These provisions were held to be mandatory. In the opinion the court said:

"It is insisted that the provision is directory only, and that, if the purpose of the voter can be ascertained with reasonable certainty from the ballot cast by him, effect should be given to it. Unquestionably, prior to the passage of chapter 78 by the legislature of 1893, the rule that the intent of the voter, as evidenced by his ballot, is controlling in the count thereof was by a long course of judicial determination firmly imbedded in the jurisprudence of this state. . . . . The enactment of that statute was designed to inaugurate an important departure from the mode of voting and counting votes which had existed in this state prior to its passage. If the legislature intended to say that a ballot which had failed to accord with certain specifically enumerated requirements on the part of the voter could not be counted, the purpose of the legislature, irrespective of all considerations as to the intent or effect of such failure, if not unconstitutional, cannot be disregarded by courts. If the statute is harsh in its terms the remedy is with the legislature. . . .

"A ballot ought to be cast by the voter intelligently and thoughtfully. If so cast, there is no trouble in complying with the provisions of chapter 78. If a person is illiterate or physically disabled he may have assistants to mark his ballot. No one is disfranchised by the act, nor are the provisions concerning the marking of the ballot difficult to understand." (*Taylor v. Bleakley*, 55 Kan. 1, 8, 9, 14, 39 Pac. 1045.)

The Australian ballot law was completely revised in 1897 and the first law was repealed. The position of voting squares was changed to the right of the names of candidates, and use of anything but a black lead pencil in marking ballots was prohibited. Sections 14, 22 and 25 of the Laws of 1893 were modified to include these changes, but not otherwise. Some words omitted in printing the 1893 law were included in section 27, which was made to read as follows:

"Any person who shall, except as herein otherwise provided, mark . . . his ballot so that it can be distinguished, . . . or who shall place upon . . . his . . . ballot any character or mark for the purpose of identifying said ballot, . . . shall, upon conviction, be punished. . . ." (Laws 1897, ch. 129, § 27.)

In 1901 the law was again revised. It provided for voting a straight party ticket by making a cross in a circle under a party emblem. National, state, county and township tickets for all parties and for independent nominations were all printed on one sheet, which also contained a blank column in which other names might be written. The following provisions were inserted:

"It shall not be lawful to make any mark upon an official ballot other than the cross ✕ mark used for the purpose of voting, with a pencil having black lead, and that only in the circle at the top of the tickets or in the voting squares at the right of the names of candidates, or to write anything thereon other than the name or names of persons not printed upon the ballot

for whom the voter desires to vote in the blank column under the appropriate title of the office, or to deface or tear a ballot in any manner, or to erase any printed device, emblem, figure, letter or word therefrom, . . .

"In canvassing the votes, and in all election contests, the following rules, in addition to the other provisions of this act, shall be observed: One line crossing another line at any angle within a circle or voting square shall be deemed a valid voting mark. Any ballot upon which there shall be found a cross ✕ mark outside any circle or voting square, or upon which there shall be found any other mark than the cross ✕ mark used for the purpose of voting, or upon which shall be found a cross ✕ mark in a circle at the head of the ticket and also in one or more squares after the names of candidates on the ballots, unless the cross ✕ mark shall appear in each square after the name of each candidate in the same column indicated by the cross ✕ mark at the head of the ticket, or upon which there shall be found a cross ✕ mark in two or more circles at the head of different tickets, or upon which a name or names have been written otherwise than as heretofore provided, or upon which the voter has marked more candidates than there are persons to be elected to an office, or any ballot which has been defaced or torn by the voter, or from which there shall have been erased any device, emblem, figure, letter or word, or any ballot which shall have been marked or written upon with other than a pencil having black lead, shall be wholly void and no vote thereon shall be counted." (Laws 1901, ch. 177, §§ 10, 11.)

The penal section of the former act was retained.

In 1903 an election was held for the office of mayor of Concordia under the law of 1901. A proceeding in quo warranto was commenced in the district court to determine right of the person receiving the certificate of election to hold the office. From the judgment of the district court an appeal was taken to this court. (*Wheeler v. Caldwell*, 68 Kan. 776, 75 Pac. 1031.) The syllabus reads:

"Where one of the lines of a cross on a ballot is paralleled by a third distinct line, it should be regarded as a distinguishing mark and the ballot treated as illegal.

"The mere fact that one of the lines of a cross mark on a ballot is shorter than the other one does not warrant the rejection of the ballot, where the shorter line actually crosses the longer one." (¶¶ 4, 5.)

In the opinion it was said:

"The legality of a large number of defectively marked ballots was challenged. In the counting of such ballots the [district] court adopted what may be called a very liberal rule. It said:

"'Upon the trial, when the various numbered votes (those numbered by the stenographer) were taken from the wires and examined, many of them for the plaintiff Caldwell had crosses in the proper places, but the crosses were not always made with two single lines, and in many instances there would be one or more additional lines, but they appeared to be so made simply for a desire on the voter's part and in the effort on his part to make a cross with lines so distinct and plain that his vote should not be overlooked from

Wall v. Pierpont.

lack of plainness; and in many instances one or more arms of the cross would extend somewhat over the circle—that is, outside—or outside the squares, whichever form of voting was used, and this was apparently due either to haste or carelessness on the part of the voter; in some instances the marks were ill made, due to nervousness, or to the fact that the hand making them trembled with age· or was unused to a pencil. What has been said in this finding with reference to ballots voted for Caldwell is equally true as to many ballots voted for Wheeler, and the number of ballots so marked was probably about equal in number and in the character of their markings on both sides, and the court in counting such ballots has intended to and did count for the person for whom they were marked all such as showed the intention of the voter and were marked with a cross mark in the proper place, and the marks were not such as to be in character a distinguishing mark, and where they were clearly not made by the voter with an evident purpose to identify his ballot.'

"Of this rule, in the abstract, there is no good reason for complaint; but we are unable to agree with the court in its application. For instance, there was a ballot numbered 100, cast in the fourth ward and counted for Caldwell, on which there was a cross in the circle composed of three lines. One of the arms of the cross was substantially paralleled by a third distinct line. There is nothing to indicate that the extra line was an attempt to retrace an indistinct line, or that it was made by one who was nervous or unused to a pencil. The departure from the prescribed form is patent, easily described, and it would be difficult to invent a better distinguishing mark." (pp. 784, 785.)

An amendment to the ballot law adopted in 1903 provided for separate printing of general ballots, township ballots and city ballots. The rules for furnishing, marking and counting ballots remained the same. In the spring of 1905 an election was held in the city of Olathe. Glover received the certificate of election for mayor, and Ogg brought an action of quo warranto in this court. (*Ogg v. Glover*, 72 Kan. 247, 83 Pac. 1039.) In the opinion the court said:

"In this recanvass, wherever the voter has apparently attempted in good faith to comply with the statute by making simple cross marks in the proper squares, effect has been given to his intention as so expressed, even although some departure from symmetry and regularity is shown; for instance, where a pencil mark is made double for a part of its length, or for all of it, in an evident attempt to make it plainer, or where accidental hooks or curves appear at the ends of the lines caused by carelessness in removing the pencil. Irregularities of this character, being incapable of accurate description, and not being adapted to use as a means for the subsequent identification of the ballot, are not considered destructive of the voter's purpose.

"Ballots have been rejected for the following causes:  .  .  .   (2) The placing in any square of a cross one of the arms of which is distinctly and

purposely paralleled by a third line, forming such a figure as this: ⊠
(*Wheeler v. Caldwell*, 68 Kan. 776, 75 Pac. 1031.)   (3) The placing in any square or circle of a distinct third line in addition to the two forming the

cross, although not parallel to either, forming such a figure as this: ⊠
.  .  .  . (p. 260.)

In *Ogg v. Glover* the plaintiff's name appeared on what was called "city ticket." There was no emblem over the circle, and it was contended the circle could be employed for voting only in connection with some party emblem. In dealing with the subject the court said the case was within the spirit of the decision in *Boyd v. Mills*, supra, notwithstanding a change in the law. Continuing, the court said:

"The courts of England and Australia have given a very technical construction to statutes of this character. The supreme court of Montana originally followed their lead in this respect, upon the principle that in adopting a foreign statute the legislature was to be deemed to have adopted also the interpretation already given it by the courts of the country from which it was borrowed. (*Price v. Lush,* 10 Mont. 61, 24 Pac. 749, 9 L. R. A. 467.) Later, however, yielding to the argument that restrictions upon the electoral franchise should be employed with more caution in this country than under other forms of government, the court disapproved this case, and after a very thorough review of the American decisions reached the conclusion that an election otherwise legally and fairly conducted was not to be invalidated by reason of an irregularity in the preparation of the ballot. (*Stackpole v. Hallahan,* 16 Mont. 40, 40 Pac. 80, 28 L. R. A. 502.) This is unquestionably in accordance with the great weight of authority in the United States." (*Ogg v. Glover,* 72 Kan. 247, 256, 83 Pac. 1039.)

The decision was that the omission of an emblem afforded no ground for rejecting ballots.

At the legislative session of 1905 the ballot law was amended. The act did not take effect, however, until June following the Olathe election. Experience had demonstrated that the rules for voting were too technical, and the amendments nullified certain causes for rejecting ballots stated in the opinion in *Ogg v. Glover*, not including, however, those referred to above.

In the case of *Peabody v. Burch,* 75 Kan. 543, 89 Pac. 1016, decided in 1907, the court had under consideration whether an election to office in Atchison county was invalidated because a ticket not entitled to a place on the official ballot was printed there and was used by voters. The subject of marking ballots was not involved. In the opinion the court said:

"The adoption of the Australian ballot law has made a great change in the method of ascertaining and giving effect to the popular will. Formerly the rule was to count any ballot from which by any reasonable method of interpretation the purpose of the person casting it could be gathered. Now such purpose, however clearly shown, is disregarded unless expressed in a particular way. Legislative restrictions upon the exercise of the right of suffrage are enforced by the courts without hesitation to the very letter, so long as they relate to matters within the control of the individual voter. But with respect

Wall v. Pierpont.

to regulations regarding the conduct of others the effort is still to seek such a construction of the law as will accomplish rather than defeat the expressed wishes of the people." (p. 545.)

The case of *Mathewson v. Campbell*, 91 Kan. 625, 138 Pac. 637, involved a contest for a county office in Brown county, following the election of 1912. The court held that defects resulting from the manner in which the official ballots had been prepared for delivery to voters did not invalidate. Other defects were dealt with as follows:

"A number of ballots were properly rejected because of markings which fell within the express prohibition of the statute and the condemnation of the court in prior decisions. For instance, a number were marked with a purple-colored pencil. On some marks and figures were placed outside of the squares and on the margin of the ballots. A number of them were where the voter had made more lines than were necessary to make a cross mark, and still others had peculiar markings not at all like the cross mark prescribed by statute. Names were written on ballots with no cross marks in the squares opposite the names so written. . . . None of them can be regarded as legal ballots." (p. 631.)

The foregoing summarizes the statutes and the principal decisions interpreting the statutes as they stood previous to the year 1913. In that year the legislature enacted a ballot law framed upon the Massachusetts model. The following features of the earlier statutes pertinent to the present controversy were preserved:

"Ballots shall be so printed as to give each voter an opportunity to designate by a cross ✕ in the square at the right of the name and designation of each candidate his choice of candidates. . . .

"It shall not be lawful to make any mark upon any official ballot other than a cross mark used for the purpose of voting with a lead pencil in the voting squares at the right of the names of candidates, or to write anything thereon other than the name or names of persons not printed on the ballot for whom the voter desires to vote in the blank space under the appropriate title of the office, or to deface or tear a ballot in any manner, or to erase any printed figure, letter or word therefrom, or to paste anything thereon, or for any person other than the voter to erase any mark or name written thereon by the voter. Whenever a cross mark shall be made in the square at the right of the names of more than one candidate for the same office such vote shall not invalidate the whole ballot but shall invalidate that part and that portion only and the same shall not be counted for any such candidate. . . . The voter shall observe the following rules in marking his ballots: He shall make the cross mark in the square to the right of the names of such candidates as he desires to vote for and nowhere else on the ballot. If he desires to vote for a name not on the ballot, write the name in the blank space under the appropriate title of the office and make a cross ✕ mark in the square to the right of such name. . . .

"In canvassing the votes, and in all election contests, the following rules, in addition to the other provisions of this act, shall be observed: One line crossing another line at any angle within a voting 'square shall be deemed a valid voting mark. Any ballot upon which there shall be found a cross mark outside any voting square, or upon which there shall be found any other mark than the cross mark used for the purpose of voting, or upon which the names have been written otherwise than as heretofore provided, or any ballot which has been defaced or torn by the voter, or from which there shall have been erased any figures, letter or word, or any ballot which shall have been marked by or written upon with other than a pencil, shall be wholly void, and no vote thereon shall be counted. Whenever a cross $\times$ mark shall be made in the square at the right of the name of more than one candidate for the same office, such vote shall not invalidate the ballot, nor shall the same be counted for any such candidate. . . .

"Any person who shall, except as herein otherwise provided, mark or fold his ballot so that it can be distinguished, . . . or who shall place upon . . . his . . . ballot any character or mark for the purpose of identifying said ballot, . . . shall upon conviction be punished . . ." (R. S. 25-602, 25-416, 25-419, 25-1716.)

The following provision appeared for the first time in the history of ballot legislation in this state:

"No ballot shall be invalidated and thus thrown out because a cross within the square is not made with mathematical precision. The intent of the voter must be first considered, and if in the opinion of the judges the cross is not an identifying mark the ballot shall be counted." (R. S. 25-420.)

The statute of 1913 continued in force the provision of earlier statutes found in the rules for guidance of voters, that before leaving the booth the voter should fold his ballot so as to conceal his markings; and continued in force the provisions of the penal section of earlier statutes that the voter who shall allow his ballot to be seen with apparent intention to disclose his vote, shall be punished. These provisions were considered in the case of *Hooper v. McNaughton,* 113 Kan. 405, 214 Pac. 613, and it was held the district court did not err in refusing to exclude from the count of votes all the ballots of a precinct for the following reasons:

"Failure of voter to fold his marked ballot; nonconcealment by voter of his ballot; reception and deposit in the ballot box of such ballots; and deposit of such ballots in the ballot box after the voter retired." (Syl. ¶ 1.)

In the opinion it was said:

"The primary object of an election law, which transcends all other objects in importance, is to provide means for effective exercise of suffrage. Secrecy is subsidiary, a means to that end. To vitiate a ballot, disregard of secrecy must be so mischievous as to warrant disfranchisement. To insure secrecy the statute requires that the curtains of voting booths must come to within

Wall v. Pierpont.

two feet of the floor of the polling place. No one would contend that if the curtain of one of a number of booths at a precinct should, through inadvertence, be six inches short, the election in that precinct would be void. To insure secrecy the statute provides that any ballot which shall have been marked or written upon with other than a pencil shall be wholly void, and no vote thereon shall be counted. That provision is mandatory. When the legislative intention is not so plain, whether nonobservance of a regulation avoids a ballot depends on the intimacy of the relation between the regulation and the general purpose to be accomplished, and the nature and extent of the departure. Generally, a voter may be held to strict compliance with rules laid down for his own guidance. Generally, he is not disfranchised for nonconformity by others with rules laid down for their guidance. Generally, innocent voters are not disfranchised on account of the conduct of other individual voters. Contestants for office may have illegal ballots thrown out, but the legal votes of a precinct may not also be thrown out unless conduct has been so flagrant as to corrupt the entire vote. . . .

"No penalty is imposed on the voter unless he acts with apparent improper intent. There is no prohibition against counting a ballot allowed to be seen through accident, or inadvertence, or blameless lack of understanding of the significance of secrecy, and there is no implication of prohibition, in the absence of apparent improper intention. The conclusion must be, the legislature did not regard nonconcealment as working disfranchisement in every case. Although the provisions of section 4217 are highly important, and ought to be observed in all cases, they are not mandatory in the strict legal sense of the term, and the question whether an exposed ballot should be counted depends on the circumstances attending the exposure." (pp. 407, 408.)

The result was that, under circumstances stated in the opinion, voters were not held to strict compliance with rules laid down for their own guidance. No other decision of importance interpreting the ballot law, rendered since 1913, is referred to by the litigants.

Plaintiff has selected from the ballots which he contends were erroneously counted by the commissioner, approximately eighty which exhibit representative defects, and has caused photostatic copies of the markings to be made. Some of these copies are appended to this opinion. It will appear later that the whole ballot should be considered whenever particular marks are to be interpreted.

The argument that any mark of the character indicated *ispo facto* invalidates the ballot rests in final analysis upon *ita lex scripta est*. The statute speaks of a cross and nothing else. When the term "voting mark" is used it refers to a cross. The form of cross is shown in the statute, and consists of two straight lines intersecting each other, and nothing else. One line crossing another at any angle within the voting square will suffice. But the cross still consists of one line intersecting another. No digression is permissible except in

angle of intersection. Any mark falling short of or exceeding these requirements is not a cross, and any kind of mark, simple or otherwise, not forming a cross as thus defined is not a voting mark. Any mark except a cross in the square, used for voting, is a forbidden mark, and whether a mark is a distinguishing mark is a question of law, whatever the intention of the voter or the opinion of canvassing officers.

The foregoing course of reasoning is perfectly simple, strictly logical, and is sustained by authority. Plaintiff concedes, however, it cannot prevail in all its stark literalness, and the position upon which he rests his case may be summarized as follows: It is not necessary that the voter express his intentions with strict regard for symmetry. There must be some allowance made for trifling inaccuracies and inexactitudes, due to infirmity, inability and lack of skill, and due to inadvertence, accident and mistake; but intent to vote in the statutory way must appear. There is no method of ascertaining intention of a voter save by the marks he made on his ballot. The legislature in plain language has prescribed the voting mark. It is the familiar, simple cross, consisting of one line crossing another. When other marks or lines occur which were made not as a part of this cross mark, the mark is an identifying mark, and not a voting mark. The mark itself proclaims the fact, and the law pronounces the consequence.

Plaintiff contends the decisions of this court sustain him in the views which have been expressed, and it becomes necessary to examine the decisions critically to ascertain the precise position of the court. The cases relating to subjects other than marking the ballot. need not be considered, and anything said in the opinions in those cases about marking the ballot is not conclusive and need not be considered.

In *Taylor v. Bleakley*, 55 Kan. 1, 39 Pac. 1045, the voter did not place his cross in the only place where it should have been placed as a voting mark, and the ballot was condemned by express provision of statute.

In the case of *Wheeler v. Caldwell*, 68 Kan. 776, 75 Pac. 1031, this court said the district court adopted a very liberal rule. The district court regarded intention of the voter as important, and in determining intention referred to the following: (a) Additional lines apparently made through desire on the voter's part to make his vote plain; (b) extension of lines beyond the square, due to haste or

carelessness; (c) ill-made marks due to nervousness; (d) ill-made marks due to the fact the hands making them trembled with age; (e) ill-made marks due to the fact the hands making them were unused to a pencil. This court did not express approval of the opinion of the district court. This court said there was no good reason to complain of the district court's rule in the "abstract." The statement was anodyne only, because the rule of the district court was entirely concrete. The rule upon which this court then rested its decision was distinctly illiberal. Nothing was dealt with except an extra line. The possible causes for such a line which the court considered were: (a) Attempt to retrace an indistinct line; (b) nervousness; (c) unfamiliarity with use of a pencil. None of these causes was regarded as adequate to account for the extra line. The departure from the prescribed form was patent, was easily described, and was said to be well adapted for use as a distinguishing mark. Consequently the intention of the voter was immaterial and the ballot was condemned by the law.

In *Ogg v. Glover*, 72 Kan. 247, 83 Pac. 1039, intention of the voter was sought for and allowed to prevail to this extent only: (a) A double mark made in evident attempt to make it plainer; (b) accidental hooks or curves at the ends of lines, caused by carelessness in removing the pencil. The result was, third lines definitely and purposely made, whether parallel or not parallel, invalidated the ballot, as a matter of law.

*Mathewson v. Campbell*, 91 Kan. 625, 138 Pac. 637, was decided after the 1913 statute was enacted, but under the old law. More lines than were necessary to make a cross, and peculiar markings not like a cross, appeared. The rule that the voter will be held to the letter of the law in respect to matters under his control was applied, and the ballots were condemned. That rule was not relaxed until *Hooper v. McNaughton*, 113 Kan. 405, 214 Pac. 613, was decided in 1923, and that case did not involve ballot marking.

The result is, with certain reservations which do not affect the ultimate conclusion, the decisions of this court, based upon the statutes as they existed previous to 1913, sustain plaintiff's position, and approval or disapproval of the commissioner's report depends on whether the statute of 1913 changed the law. As indicated above, the statute of 1913 preserved portions of the old law material to the controversy, and the question reduces to whether the new sec · tion, now appearing as R. S. 25-420, changed the law.

Plaintiff contends the provision had these effects and no other: Marks other than a cross mark, consisting of one line crossing another at any angle within the voting square, already stood condemned by statute and judicial decision. The limited exceptions which the court had made for infirmity and the like were given legislative sanction by comprehending them under the term "mathematical precision" and eliminating them as causes for throwing out ballots. That left just the cross, properly made, to be taken into account as an identifying mark. Upon that subject the intent of the voter may be considered, and if in the opinion of the judges the cross was not used for the purpose of identifying the ballot, the ballot should be counted. In plaintiff's brief it is said:

"The intent of the voter to make or not to make the voting cross prescribed by statute is the only intent for determination by the judges of election, and this necessarily limited discretion in the judges of election is confined to the determination as to whether a cross mark and not any other mark is an identifying mark. The sections of the statute other than section 25-420, heretofore referred to, definitely, expressly and empirically declare that all other marks upon the ballot except the voting cross rendered the ballot void."

The court rejects this interpretation of the statute of 1913 *in toto*.

Consider ballot No. 1408, chosen for consideration because it exhibits marking held to invalidate in *Ogg v. Glover* and other cases. What occurred when that ballot was marked? A downward stroke from right to left was made first. In attempting to make a downward stroke from left to right, the lower left-hand corner of the square was barely clipped. Hancock's name was the last one on the ballot, and the office was a city office. There is lack of uniformity in the marks in the nineteen crosses on the ballot. A tendency to relax concentration and to clip the lower left-hand corner of the square with the downward stroke from left to right, as the voter approached the end of the ballot, appears in the two crosses just preceding the one opposite Hancock's name. The voter had finished marking his ballot when he indicated his choice for this last and minor office, and what would have been his last stroke of the pencil, had it been accurate, was executed without sufficient care. The result was a poor cross, and the voter undertook to better it. The downward stroke from right to left was reinforced and, beginning in the very corner of the square, the second line downward from left to right was firmly drawn. The voter intended to make the two parallel lines, but his intention was to mark his ballot according to law, with a cross in the square.

Wall v. Pierpont.

How does the court know this ballot was made in honest attempt to exercise the right of suffrage? What is its method of inference?

In the first place, the court examines the memorial of the voter's conduct which he made—the ballot—and notes the results. It then regards the presumption that the voter was not corrupt, and gives weight to the probability of fact that the voter intended to vote—that he did not take the time and expend the effort involved in going to the polls and going through the form of voting for the conceived purpose of marking his ballot so it could not be counted. The court then applies the scientific method of concluding from an effect to the preëxistence of a cause competent to produce that effect. The basis of the method consists of two axioms, forming the foundation of all scientific thought: constancy in the order of nature, and like effects imply like causes. In this instance effects and causes all lie in the field of common experience. No occult, profound or subtle discernment is required in relating them. As a matter of fact, the field is so familiar that all the court does is to use a modicum of common sense, and proceed as men proceed in daily life—account for effects by causes which have been verified over and over again as capable of producing them. Plaintiff recognizes validity of the method to this extent: He approves decisions which have attributed wavering lines to trembling hands, and which have attributed certain marks to retracing of a line to make sure the line was made.

Ten years after the Australian ballot law was placed on the statute book voters in Concordia were paralleling one arm of the cross by a third line, and losing their votes. Twelve years after the law was enacted voters in Olathe were doing the same thing, with the same result. Nineteen years after the law was enacted voters in Brown county were doing the same thing, with the same result. And now, thirty-one years after the law was enacted, we find voters from every part of Sedgwick county paralleling one arm of the cross with a third line. Once more, using a little common sense, it is plain the electorate of this state cannot be regimented on election day and made to go in goose-step fashion through a meticulous process of voting in perfect form; and parallel lines and other third lines are inevitable consequences of use of the cross as a voting mark.

It is said the law is plain and its requirements are simple. Neither statement is true when brought down to the act of marking ballots

28—119 KAN.

by large classes of voters, who are nevertheless entitled to express
their choice of persons to fill public offices.  It is said that if per-
sons desire to vote they should inform themselves, and if they lose
their votes it is their own fault.  This represents the supercilious
attitude of the "intelligentsia" which was given supreme expression
in a dissenting opinion in *Parker v. Hughes*, 64 Kan. 216, 67
Pac. 637:

"Quality first and quantity afterward. . . . If the citizen would vote,
let him prepare himself to do so in the manner that the law prescribes."
(p. 226.)

It is said that a voter who needs help in marking his ballot can
have it.  He can have help only if he is unable to mark his ballot
by reason of physical disability, to which he must make oath.  He
must be in practical extremity, because if he makes a false state-
ment as to his ability to mark his ballot he is subject to fine and
imprisonment.  If he accepts aid he forfeits privacy.

It is said the ballot must, of all civic things, be kept pure, and
that no loophole should be left for marked ballots.  At first legis-
lative and judicial attention was focused on the voting square as
the place where identifying marks might be found.  Experience in
operation of the law proved several things.  Identifying marks in
the voting square deprived candidates of votes which had been paid
for, and so were unprofitable.  If an identifying mark were agreed
on and used, or were made and then described to the briber, it was
quite likely that when the ballot box was opened it was found to
contain many ballots innocently marked so nearly in the same
way that the corrupt ballot could not be identified.  So many ways
of identifying ballots which baffle detection were open that there
was no need to resort to the dubious one of peculiar markings in
the square.  One such way was to write an agreed name in a blank
space and put a cross in the square to the right.  The result was
that apprehended evil did not materialize, while harsh application
of the rigorous rules produced unjust results of too great magnitude.

The notion that intent of the voter was important in determining
validity of a ballot, and that an attempt in good faith to comply
with the law ought to be given effect, was the common possession of
the electorate previous to adoption of the Australian ballot law,
and was not suppressed by that law.  The case of *Ogg v. Glover*
was decided in 1905.  The strict interpretation which the court had
previously placed on the statute had apparently met with approval

of the legislature, and the ballots whose markings are shown in the opinion in that case were thrown out. The decision occasioned popular resentment against the law, and the court could extend this statement further. The legislature of 1907 did nothing about it, and beginning with the special session of 1908 the primary was the chief subject of election regulation until 1913. The ballot law was then thoroughly revised. The section under consideration was inserted, and intention of the voter, which had played small part in ballot counting for twenty years, was for the first time given express recognition in the ballot law.

The court is of the opinion the legislature did not go through the form of enacting into law what, by judicial interpretation of the statute, was already the law, and did not tie down consideration of the voter's intention to whether his faultless cross is a distinguishing mark. The purpose was to remedy mischievous results flowing from enforcement of a repressive measure which was doing little if any good and much harm. "Precise" means having determinate limitations, and "mathematical" means theoretically precise (Webster's International Dictionary). Plainly, the legislature did not intend to say the cross need not be made with theoretically precise precision. The legislature was dealing with familiar things in mathematics—number, line, angle. The law already recognized that one line crossing another line at any angle makes a good cross, and the purpose was to say that no ballot shall be invalidated because the cross varies from those determinate limitations. In considering departures from the true cross of one line, one other line, and one crossing of those lines at any angle, the intent of the voter is of primary importance, and if the variants do not, in the opinion of the judges, make of the cross an identifying mark, the ballot shall be counted. Being remedial, the statute must be liberally construed.

Plaintiff contends such an interpretation of the statute is not permissible because it throws certainty to the winds, destroys uniformity of rule and system, and leaves determination of the intent of voters to speculation and conjecture and the widely varying opinions of none too well-informed election officials. The equal suffrage amendment to the state constitution had been adopted at the general election held in November, 1912, and the problem was how to obtain the best result from universal adult suffrage. Voters in large numbers are not, and many of them are so constituted they

cannot be, punctilious in observance of highly contrived restrictions on the voting act. It is of no avail to dragoon them for it. The legislature of 1905 concluded that we suffered from an overplus of rule and system, and liberalized the requirements for correct ballot marking. The legislature of 1913 removed the restriction that the pencil used must be black in color, and if it felt that the technic of cross making for voting purposes was too refined, it had constitutional authority to adopt a policy which makes honesty of more importance than artistry. In determining from the face of a ballot whether marks upon it were made in good faith or bad faith, the election judges proceed according to the method which this court employed, to the extent permissible, in *Wheeler v. Caldwell* and in *Ogg v. Glover,* and freely employed in considering a ballot representative of a class counted for defendant. The method is the same method which election judges have been accustomed to employ in the interpretation of ballot markings. More than 35,000 ballots were presented to the commissioner for counting. The record discloses no ballot challenged because a cross scrupulously made according to plaintiff's conception of the voting cross constituted an identifying mark. What qualification of low degree or high degree is necessary to enable one to determine the voter's intention in case of such challenge, the court is unable to declare; but according to plaintiff's interpretation of the statute, the legislature must have considered that election boards possess the requisite astuteness.

Plaintiff's brief contains the following paragraph:

"In the event, however, that this court should overrule all of its prior decisions, and should reach the conclusion that the provisions of section 25-420 supersede and set aside the salutary rules therein laid down, then and in that event plaintiff asserts that the condition of the defendant's cause would be just as hopeless as it now is under the prior decision of this court."

Plaintiff then proceeds to show that by applying to other sections of the statute the provision of the new section that intent of the voter must be first considered, he would be elected on a recount of ballots referred to in findings 7 and 8. The question thus disingenuously presented is whether the new section refers to anything except a cross mark within the square at the right of names of candidates, used for voting purposes. Manifestly it does not. Other provisions of the statute stand in their original integrity, and the section cannot be applied to marks or writings which it is not lawful

to make (R. S. 25-416), or which render the ballot void (R. S. 25-419).

The conclusions stated render it unnecessary to discuss particular ballot markings or to revise the commissioner's count. The court has not read all of the 3,700 ballots returned by the commissioner. It has examined all classes of ballots which it is claimed might affect the result. The court is in doubt with respect to application of the commissioner's conclusions of law to a few ballots. It would consume too much space to discuss them, and the instances in which the court's judgment might for any reason differ from that of the commissioner would not affect the finding that defendant was elected.

The commissioner's conclusions of law, except the conclusion that defendant's majority was 114, are approved. The court finds for the defendant; and the judgment is that Grover Pierpont received a majority of all the valid ballots cast at the election held on November 4, 1924, and was duly elected to the office of judge of the eighteenth judicial district, third division.

---

### Appendix A.

#### Report of J. V. Humphrey, *Commissioner.*

From the evidence introduced herein, I make the following findings of fact:

1. The parties hereto, Jesse D. Wall, plaintiff, and Grover Pierpont, defendant, were opposing candidates for the office of judge of the district court of the eighteenth judicial district, third division thereof, at the election held November 4, 1924. The emoluments of the office are a salary of $4,000 per annum as judge and $600 per annum as jury commissioner. Both parties were eligible to the office.

2. Sedgwick county has seventy-nine voting precincts. Plaintiff at the commencement of the hearing (February 4) demanded the privilege of a recount of the ballots in all the precincts, and it was orally agreed between the parties that either party should have the right to require all the ballots of all the precincts to be examined and counted, subject only to the right to show that the ballots of any of the precincts were not authentic or had been so tampered with that they should not be taken to show the correct result of the voting in such precincts.

3. All of the ballots cast by the voters of Sedgwick county at said election were by the proper election officials of said seventy-nine precincts, respectively, forthwith, following their count by said officials, delivered to the county clerk in containers consisting of sacks, boxes, or both, and the county clerk, from

the time of their said delivery until produced before me, kept said ballots intact in said original containers and free from molestation of any sort. All of said ballots were by the county clerk produced before me in said containers, and from said containers, under my direction and supervision, all of said ballots which had printed thereon the designation "Official general ballot, district, county and township ticket," the same being the ballots on which this office was voted for, were taken, submitted to said parties and their counsel for examination, approval and objection, if any, and then by me considered and either counted or rejected. What is said in this paragraph applies equally to the "blank, defective and objected-to" ballots.

4. For convenience, all ballots which were offered to me as containing a vote for plaintiff are hereinafter referred to as "Wall ballots," and those offered as containing a vote for defendant as "Pierpont ballots."

5. A number of ballots, taken from the "blank, defective and objected-to" envelopes returned by the precinct election officials, were examined by counsel of both parties, and by mutual agreement of counsel passed back to the county clerk, as being invalid, without being presented to me. These were not considered by me nor entered in any way into the count. All other ballots, which were not objected to by either party, were at once counted for the proper party, tally of the count being kept by two clerks, and then at once strung by another employee and returned to the custody of the county clerk. All ballots objected to by either party were by me passed upon immediately; such as were decided to be valid were at once properly tallied by the clerks keeping the tally. All ballots objected to were by the stenographer marked as an exhibit with proper number, and were then retained by me. Counsel, in making objections, made statement thereof to the stenographer, and at the same time, with a finger, pointed to the supposed vitiating element upon the ballot. Upon the back of each ballot I made an indorsement by a few letters, sometimes words, of the objection as visualized by me, the party making the same, and the ruling. All said ballots objected to are by me herewith delivered to the clerk of this court. They have been assembled into separate packages according to the nature of the objection, party making same, and ruling, all of which appears on a label on each package. The packages have been placed in sacks, which again are labeled, showing their contents.

It perhaps should be mentioned that among these objected-to ballots are a few, probably not to exceed half dozen, on which neither party was voted for, but which in the actual work of the count came down on the "Pierpont" side of the table and were therefore recorded as Pierpont objections to Wall ballots. In this work the county clerk and his assistant, in taking out the ballots, unfolded and looked at them and handed Wall's to the Pierpont side and Pierpont's to the Wall.

6. There were presented to me 17,824 ballots as being Wall ballots, of which 16,921 were valid ballots and valid votes for him and were so counted. There were presented to me 17,801 ballots as Pierpont ballots, of which 17,035 were valid ballots and valid votes for Pierpont and were counted for him.

Wall v. Pierpont.

7. Of the ballots so presented to me, ballots for the parties, respectively, were invalid and rejected for reasons as follows:

|  | | Wall. | Pierpont. |
|---|---|---|---|
| ⊠ | Opposite blank space | 520 | 348 |
| ◺ | Opposite name | 62 | 45 |
| ◹ | Opposite blank space | 27 | 33 |
| | Name written, not voted | 203 | 234 |
| | Markings outside squares | 28 | 26 |
| | Squares defaced | 51 | 68 |
| | Crosses made with ink | 8 | 8 |
| | Check mark | ... | 2 |
| | Name printed and written for same office | ... | 2 |
| | Ballots absent voters | 4 | ... |
| | | 903 | 766 |

I do not find that in the above cases where the cross mark was put in the square opposite the blank spaces left on the ballot for the writing in of names not printed, or where a single line was made in the squares either opposite a printed name or opposite a blank space, or where a name was written in a blank space but not voted by means of a cross mark in the square opposite, there was any intention on the part of the voters so marking their respective ballots of identifying their ballots. I merely find that such ballots were marked or written upon in character and in numbers as shown by said table. As to the "marks not in the squares," "squares defaced," "ink," "check marks" and "name printed and written for same office," in some instances the voter doubtless intended to identify his ballot. In most of them he did not. I have not separated the two from each other, but am covering all of the same simply with the finding that the marks defacing, ink and check marks and names printed and written for the same office were done and used as indicated in said table.

The absent voters' ballots rejected as above consisted of ballot marked exhibit 3,807, in which the name of Jesse D. Wall was written under the designation of office of "State senator"; ballot marked exhibit 3,806, in which the name of Jesse D. Wall was written under the designation of office of "Representative"; and ballot marked exhibit 3,802, in which the name of plaintiff was written under the designation of office of "County clerk"; in all these cases there being no explanation nor expression on the ballot, other than the mere writing of Mr. Wall's name, that he was being voted for for the office of judge. Ballot No. 3,770 was rejected because it was not written at all upon the ballot or paper officially furnished, but upon an ordinary piece of paper with all names and official positions written thereon.

8. After the ballot had been once counted, counsel requested opportunity for oral argument, and thereafter the privilege of inspecting and going over the objected-to ballots a second time and of invoking a change of ruling upon any of them, which request was acceded to. Thereupon I called to the attention of counsel that both sides were objecting to ballots in all cases where a

cross mark was made opposite a blank space, or a single line was made in the square opposite either a name or a blank space, or a name was written in a blank space and not voted by the placing of a proper cross mark, and requested that if either party contended that any of such ballots were valid, such party should advise me thereof. At the oral argument which subsequently took place, counsel for both parties candidly, fully and with precision advised me that they regarded the ballots in the cases just enumerated as being wholly invalid.

9. Of the ballots so as aforesaid presented to me, 1,326 Pierpont ballots and 73 Wall ballots were objected to on the ground of various imperfections of the cross marks made in the squares by the voters. These objections were all overruled and I find these to be valid ballots. The imperfections complained of range from the slightest departure in exactitude in the execution of the cross marks to those which are almost caricature of cross marks. In each and every case the voter was attempting in good faith to make a cross mark and the deviations from a correct cross mark arose from the voter's inability. The intent was to make the cross mark, and in my opinion the "cross" resulting is not an identifying mark, and in the opinion of the judges of the election in the various precincts was not an identifying mark. This particular class of ballots came practically uniformly from all of the seventy-nine precincts concerned. The defendant made comparatively few objections to Wall ballots on this ground, and those mostly from the first few precincts counted. Thereafter I noted that some of the Wall ballots passed to me by Pierpont counsel without objection had such imperfections in the cross mark. I kept no count of the same and would not be able to give the percentage of the same. The cross marks upon this class of objected-to ballots, including those denominated "parallel lines" and "other lines not necessary to the cross," were not made with such precision as to indicate a design on the part of the voter to do otherwise than make the cross necessary for voting. In a few instances of the ballots of both parties the lines designated to make a cross did not meet, but such failure not being opposite the name of either party to this case I find the same was not an identifying mark such as to invalidate the vote for the other candidates on the ticket which were properly marked.

10. Of the ballots produced before me, ninety-six Pierpont ballots and ninety-eight Wall ballots were objected to on the ground of erasures appearing upon the face of the ballot. These objections were overruled and I find these ballots to be valid.

11. Of the ballots presented to me, thirty-six Pierpont ballots and thirty-four Wall ballots were objected to by reason of a short line in a square opposite either a name or a blank space, the line having the appearance of being only the commencement of a line and the execution of it being given up before it was completed. These objections were overruled. I find them to be valid ballots.

12. Of the ballots presented to me, ninety-five Pierpont ballots and eighty-five Wall ballots were objected to on various grounds, which, on account of their number and variety, I have grouped under the name of "miscellaneous." These objections were overruled and I find them to be valid ballots.

Wall v. Pierpont.

13. Eight Wall ballots and four Pierpont ballots were objected to because after names written in in the proper space was also written the political designation as "Democrat." I at first rejected these ballots, but on reinspection announced a change of the rule and counted them. I find them to be valid ballots.

Thirteen Wall ballots and three Pierpont ballots were objected to because the same name was both printed and written on the ballot, but not for the same office. On the first count I rejected these ballots, but announced on the reinspection a change of the rule and counted them for the respective parties. I find them to be valid ballots.

Since the hearing at Wichita I have found five other Wall ballots which were rejected on the first count for the last above reason, and which counsel for plaintiff doubtless overlooked on the recount. These I find to be valid ballots and now count for Wall. They are exhibits 433, 631, 2,637, 2,370 and 1,903. Two Pierpont ballots, being exhibits 2,902 and 585, had the same name both printed and written for the same office. These were objected to and I find them to be invalid ballots. Three Wall ballots were objected to because after a name properly written in was also written the name of the office. I find these to be valid ballots. All told, there were thirty-five Wall ballots objected to for reasons mentioned in this paragraph, all of which were valid and counted, and there were seventeen Pierpont ballots so objected to, fifteen of which were valid and counted and two rejected.

14. The ballots from the "blank, defective and objected-to" envelopes returned from the different precincts were in the main treated the same as other ballots. Sixty-four of them are assembled and labeled. There may be a few others scattered in the other classes. There was some difference between the treatment of these and those coming from the string. For instance, a ballot not clipped but coming from the string of counted ballots was counted. The failure to clip was attributed to an omission of the election judge. A ballot not clipped, but from the "defective" envelope, was held not to have been voted. And in other respects, in a few instances, deductions were drawn from the fact of the presence of the ballot on the string or among the "void" ballots. Explanatory notations were made upon the backs of the ballots in these cases. The rulings upon them can only be understood by examining the ballots. I find those counted to have been valid and those not counted invalid. Those that were counted were tallied by the clerks the same as other ballots.

15. All the ballots referred to, as heretofore stated, are grouped in packages properly labeled to correspond to the classifications as dealt with in these findings. It should be stated, however, that the subject matter does not admit of exact classification. For instance, objection on the ground of "erasure" was made to many of the ballots which were also objected to on the ground of "imperfections" in the cross marks; and ballots which were objected to because of "a part of a line" in a square were also sometimes objected to on other grounds. Counsel frequently read into the record many objections to a single ballot. Consequently, assembling ballots to make one class undoes other groups. I have endeavored to classify along the lines made by taking the dominant objection to the ballots. The purpose of it is to reduce the labor in

reviewing the case; especially in the event of the contentions of parties on such review shall be confined to one or two of such classes.

The original ballots, with my notations on the back, are referred to as a proper supplement to these findings.

16. This count showed many serious mistakes to have been made in the count of the votes by the election officials, most of such mistakes apparently resulting from incorrect tallying by. the clerks. In the first precinct of the sixth ward, in addition to the error admitted by the pleadings, a correct count showed an additional gain for Wall of 116. In another precinct Pierpont gained over fifty, in another over thirty; and in still another Wall gained over twenty in this count over the count of the election officials—all apparently because of the erroneous tallying of. the election clerks. In very few precincts was the vote correctly tallied by the election officials. I am transmitting herewith cards, one for each precinct, which show the tally made by the election officials, the number of ballots of each rejected by me, the total of my count, and what my count would have been if no ballots had been rejected. These will be found in the sack together with the books containing the record of tallies of the clerk. This sack is labeled to show its contents.

Neither party offered any evidence impugning the authenticity of the ballots either in the precincts of the sixth ward or of any other precinct. There was no distinct claim made by either party that all the ballots used by the voters in each of the precincts were not produced before me in the same condition in which they left the hands of the voters except such changes as were made in or upon them in the subsequent lawful handling of them. No separate count was attempted to be made of the changes resulting to the respective standings of the parties through this erroneous talying of the clerks, except as made on said cards. These cards were prepared at my request by counsel for defendant, and the correctness of the numbers thereupon agreed to by both counsel immediately upon the count of the respective precincts being concluded. While the changes made on our reinspection are not recorded on them, they show correctly the erroneous counting by the election officials.

17. Eighteen Pierpont ballots which have been objected to by plaintiff on the ground of imperfection in the cross marks were used as exhibits in the testimony of Weston. These eighteen ballots should be added to the 1,326 Pierpont ballots referred to in finding 9. The objections were overruled and I find them to be valid ballots. Also counsel have mutually examined sixty-one ballots upon all of which was a dot or dots, and apparently agreed either that the objections would be overruled or that they should be overruled without presentation to me in detail. I find these to be valid ballots. They are in a separate package properly labeled.

18. I am returning herewith altogether, 3,746 ballots, according to my count of the same. I have not delayed making these findings until the stenographer could make his transcript. I took possession of all the ballots objected to, to which the objection was not withdrawn, and I am transmitting all of them to the clerk of this court. There may be a trifling error in making the count of these ballots. As many of the objections were withdrawn and the ballots then strung with those returned to the county clerk, the final exhibit number upon the ballots retained by me does not correctly represent the total number.

Wall v. Pierpont.

The transcript will be transmitted as soon as the stenographer completes it.

The stenographer and other persons employed to assist in the case were duly sworn to faithfully perform their respective duties. Their oaths are herewith transmitted.

### CONCLUSIONS OF LAW.

I find the conclusions of law:

1. A cross mark in a square opposite a blank space on the ballot without writing any name in such blank space invalidates the whole ballot.

2. A single line in a square opposite a blank space on the ballot invalidates the whole ballot.

3. A single line in a square opposite a printed or written name invalidates the whole ballot.

4. Writing a name in a proper blank space therefor without making a cross in the square opposite invalidates the whole ballot.

5. Any unauthorized mark, intentionally made, outside of the squares used for voting or any mark in the square, if intentionally made for other purposes than the making of a cross, invalidates the whole ballot.

6. The defacing of any square with a pencil, whether for the purpose of covering up marks already made or for any other purpose, or the intentional making of marks either in the square or out of the square for other purposes than the making of the cross mark required for voting, invalidates the ballot.

7. The use of ink in making the cross marks invalidates the ballot.

8. The intentional making of a check mark invalidates the whole ballot.

9. The making of an imperfect cross, whether the same consists in too many lines in whole or in part, or the line extending beyond the square, or the lines zigzagging, or the same being a poorly or defectively made cross for any other reason, does not invalidate the ballot if the intent of the voters in making the same was to make the cross mark and the same was not and is not an identifying mark.

10. Stray lines, lines made by a slip of the voter when attempting to make the cross and other accidental lines, do not invalidate the ballot.

11. Erasure by the voter of marks made by him, if the same does not deface or tear the ballot, does not invalidate the ballot.

12. If the voter, in erasing a mark within the square, slightly abrades the printed lines of the square, this does not invalidate the ballot if the intent of the voter appears to have been to erase his marks and not to abrade the square.

13. If a voter starts to make a line in a square, and then, as though discovering he is in the wrong square, desists and the amount of line he has made is so insignificant that he could reasonably expect it not to be noticed or taken into account by the election officials, then the same is not a "mark" within the meaning of the provisions of section 25-419, Revised Statutes, and does not invalidate the ballot.

14. Failure of the election official to clip a ballot or any marking or tearing of it by an election official does not invalidate the ballot.

15. The writing of the political designation by the voter after a name properly written in by him in the blank space does not invalidate the ballot.

Wall v. Pierpont.

16. The writing in by the voter of the name of the office after a name properly written in by him in the blank space does not invalidate the ballot.

17. The writing in of a name in a proper blank space and voting the same, though the same name is printed on the ballot, but for another office, does not invalidate the ballot.

18. The writing in of a name in a proper blank space and voting the same, when the same name is printed thereon for the same office, invalidates the ballot.

19. The unintentional failure of a voter to make two lines, intended as the cross marks in the square, meet does not invalidate the ballot as to other candidates thereon when the squares opposite their names are properly marked with a cross mark.

20. The defendant Grover Pierpont, having received a majority of 114 votes of all the valid ballots cast, was, at the election held on November 4, 1924, duly elected to the office of judge of the eighteenth judicial district, the third division thereof.

Your commissioner herewith respectfully submits the foregoing findings of fact and conclusions of law, with regret that the multifarious character of the subject matter makes it impracticable to deal more concretely with the issues involved in the case. J. V. HUMPHREY, *Commissioner.*

J. D. DICKERSON, Wichita  Democrat  ☒  *Ex. 1429*

BEN HEGLER, Wichita  Republican  ☒  *Ex. 1433*

JOSEPH BOWMAN, Wichita  Republican  ☒  *Ex. 1437*

THOMAS E. ELCOCK, Wichita  Republican  ☒  *Ex. 1439*

THOMAS E. ELCOCK, Wichita  Republican  ☒  *Ex. 1441*

CHESTER A. CONNER, Wichita  Republican  ☒  *Ex. 1447*

GROVER PIERPONT, Wichita  Democrat  ☒  *Ex. 1417*

J. O. HANCOCK, Wichita  Republican  ☒

THORNTON W. SARGENT, Wichita  Republican  ☒  *Ex. 1407*

J. D. DICKERSON, Wichita  Democrat  ☒

WALTER A. BLAKE, Wichita  Democrat  ☒

J. D. DICKERSON, Wichita  Democrat  ☒

THORNTON W. SARGENT, Wichita  Republican  ☒  *Ex. 1405*

C. F. GROVE, Wichita  Democrat  ☒

THORNTON W. SARGENT, Wichita  Republican  ☒

G. A. BROWN, Wichita  Democrat  ☒

V. M. WILKINSON, Wichita  Republican  ☒  *Ex. 1432*

THOMAS E. ELCOCK, Wichita  Republican  ☒  *Ex. 1435*

*Exhibits Weston's evidence*