No. 30,240.

DAVID M. BODDINGTON, *Plaintiff,* v. HENRY F. SCHAIBLE, *Defendant.*

(8 P. 2d 314.)

Opinion filed March 5, 1932.

*James F. Getty* and *Edward M. Boddington,* both of Kansas City, for the plaintiff.

*T. F. Railsback,* of Kansas City, for the defendant.

The opinion of the court was delivered by

HARVEY, J.: This is an original proceeding in quo warranto to contest an election. At the general election for city officers in the city of Kansas City, held April 7, 1931, the plaintiff, David M. Boddington, and the defendant, Henry F. Schaible, were opposing candidates for the office of commissioner of streets and public improvements. On April 10, 1931, the board of canvassers of the city canvassed the votes and found that the defendant had received a plurality of twenty-one votes. A certificate of election was issued to him, he was inducted into office, and has since functioned as such official. Thereafter, plaintiff brought this proceeding. On proper application this court appointed Hon. Leonard S. Ferry its commissioner to hear the evidence, make findings of fact and conclusions of law, and report to this court. The ballots were recounted by our commissioner and much other evidence was taken. He has found that the defendant received a plurality of 141 votes of all the valid ballots cast, and was therefore duly elected. Plaintiff has taken exceptions to many of the findings of fact and conclusions of law of our commissioner and has moved that they be set aside and others substituted. Defendant moves for judgment in accordance with the report of our commissioner. These motions have been heard. Elaborate abstracts and briefs have been filed and considered. The issues argued are whether certain classes of ballots should be counted, and whether any of the ballots cast at the first precinct of the first ward should be counted.

Plaintiff first argues that the court erred in overruling his objections to sixty-nine Schaible ballots in finding of fact No. 8 and conclusions of law Nos. 1, 2 and 3. Finding of fact No. 8 reads:

"Of the ballots so presented to me, seventy-six Boddington ballots and one hundred eight Schaible ballots were objected to because of a dot or dots found on the ballot. . . . I find them to be valid ballots. I find from the evidence that the election officials placed no dots on the ballots prior to giving them to the voters, and . . . in precincts numbers twenty and twenty-one the judge or judges who announced the votes made frequent marks on the ballots with a pencil during the progress of the counting."

In the envelope containing these ballots, as handed to us, there is

one Schaible ballot which the voter had marked with a pen. Plaintiff objects to the counting of that ballot. The point is well taken. Ballots to be counted should be marked with a pencil (R. S. 25-419). But it is obvious this ballot got into this group by mistake or inadvertence. Early in the counting of the ballots a few were found which had been marked with a pen. These were objected to as reached, the objection sustained, and they were laid to one side. With respect to them our commissioner ruled:

"The use of ink in making a cross mark invalidates the ballot."

His ruling on that matter was never changed throughout the hearing and is in conformity with the statute. The inadvertence, however, requires the deduction of one ballot from the count for Schaible. With respect to all of the other ballots in this group, we have examined each of the ballots and all of the evidence pertaining to them, and the dots or marks on them, and our judgment accords with that of our commissioner. It is clear from the evidence that the ballots and other election supplies were properly sealed and duly delivered to one of the judges of election, who took them to the polling place, where the seals were broken in the presence of other judges and clerks, and that there were no pencil marks on them when handed to the voters. At the time of counting the ballots the judge who read the names from the ballots used a pencil as a pointer, and frequently in calling names pressed it against the paper, making a dot or a small mark. Clearly they are not distinguishing marks, placed there by the voters, which invalidate the ballots. The commissioner also found "forty-five Boddington ballots and fifty-three Schaible ballots were objected to because of stray or accidental lines. . . . I find them to be valid ballots." We have examined these ballots and our judgment concurs with that of our commissioner. These markings are very accurately described in the classification as "stray or accidental lines," some of them scarcely discernible, and obviously made inadvertently either by the voters or by the judges of election while handling the ballots with pencil in hand.

Plaintiff next argues that the commissioner erred in overruling his objection to twenty-five Schaible ballots which were voted in indelible pencil, red crayon and red pencil. With respect to that the commissioner found:

"Eight Boddington ballots and twenty-five Schaible ballots were objected to because they were voted with pencil other than black. . . . I find them to be valid ballots."

One of our commissioner's conclusions of law is:

"The marking of a cross with an indelible or colored pencil does not invalidate a ballot."

Plaintiff contends this is an erroneous ruling of law. The point is not well taken. Our present statute relating to the canvass of ballots by election boards (R. S. 25-419) provides, among other things:

". . . Any ballot which shall have been marked by or written upon with other than a pencil shall be wholly void, . . ."

In *Wall v. Pierpont,* 119 Kan. 420, 240 Pac. 251, a history of this statute is traced, and the changes made in it from time to time are noted, and it is said:

"The legislature of 1913 removed the restriction that the pencil used must be black in color." (p. 436.)

The result is, our present statute requires the judges of the election to count the ballots, if otherwise regular, marked with a "pencil." The color of the pencil is no longer material. At the hearing before our commissioner plaintiff called an expert, who gave testimony on the distinction between a "lead pencil" and an indelible or crayon pencil. The distinction is of no importance. The statute does not use the term "lead pencil," but simply says "a pencil." Plaintiff calls our attention to R. S. 25-504, which makes it the duty of the township trustee and of the mayor and clerk of incorporated cities to provide suitable places in which to hold elections, and to see that the same are warmed, lighted, and furnished with proper supplies, including booths, shelves, and "soft black lead pencils," to enable the voter to prepare his ballot for voting, and argues that since soft black lead pencils are the only ones furnished the voters, the ballots only should be construed as valid which are marked with such pencils. We are not concerned here with the nature of the supplies furnished for voting places. Even though soft black lead pencils were furnished, a voter, with no improper intentions, might use a pencil from his pocket, and the statute with respect to the ballots to be counted is the one controlling here.

Plaintiff complains because the commissioner counted thirty-seven Schaible ballots, objected to because of imperfect and irregular crosses on the ballots. In finding No. 19 our commissioner found twenty-nine Boddington ballots and fifty-nine Schaible ballots, so objected to, to be valid ballots, stating:

"The imperfect and irregular crosses complained of by each of the parties, range from slight departure of exact crosses to those which are almost caricatures of cross marks. I find that in each and every case the voter was 'attempting to make a cross mark."

In *Wall v. Pierpont*, supra, the exception to counting ballots imperfectly marked in the squares presented the principal subject of controversy. The court reviewed previous decisions and the changes made in our election laws with respect to that question, including R. S. 25-420, which reads:

"No ballot shall be invalidated and thus thrown out because a cross within the square is not made with mathematical precision. The intent of the voter must be first considered, and if in the opinion of the judges the cross is not an identifying mark the ballot shall be counted."

In the syllabus in that case it was said:

"By virtue of . . . (R. S. 25-420) which effected a distinct change in the law relating to invalidity of ballots exhibiting irregular markings within the square opposite the names of candidates, departures from the true cross consisting of one line, one other line, and one crossing of those lines at any angle, do not as a matter of law invalidate. The intent of the voter must be first considered, and if in the opinion of the judges the cross is not an identifying mark the ballot shall be counted."

And on pages 444 and 445 are reproduced the markings on a number of the ballots counted in that case, the counting of which was approved in the opinion. Following this decision and the statutes last quoted, and having examined the ballots here in question, we concur in the finding and judgment of our commissioner. Of ballots objected to under this subdivision the commissioner found six Boddington ballots and nine Schaible ballots to be invalid. No question is raised as to that ruling.

Plaintiff takes exception to the rulings of our commissioner on several groups of ballots having erasures thereon. The excerpts from the statute pertaining to this matter are as follows: From R. S. 25-416, relating to the marking of ballots by the voter:

"It shall not be lawful . . . to deface or tear a ballot in any manner, or to erase any printed figure, letter or word therefrom, or to paste anything thereon, or for any person other than the voter to erase any mark or name written thereon by the voter. . . . If he tears, defaces or wrongly marks a ballot, he must return it to the judges and receive another."

And from R. S. 25-419, setting forth, among other things, rules which should govern the election board in the canvassing of ballots:

". . . any ballot which has been defaced or torn by the voter, or from which there shall have been erased any figure, letter or word, . . . shall be wholly void."

Our commissioner construed these statutes to mean that it was unlawful for the voter to erase any printed figure, letter or word from the ballot, but not unlawful for him to erase any mark made thereon by him. This appears to accord with the view of this court in the case of *Wall v. Pierpont,* supra. While the question of erasures was not specifically stressed in that opinion, it appears, from the findings of fact of our commissioner, made a part of the opinion, that ninety-six Pierpont ballots and ninety-eight Wall ballots were objected to on the ground of erasures appearing on the face of the ballots. These objections were overruled and the ballots found to be valid, and in the conclusions of law made by the commissioner it was held:

"Erasure by the voter of marks made by him, if the same does not deface or tear the ballot, does not invalidate the ballot."

It is true that R. S. 25-420 relates to crosses in the squares rather than to erasures, and it was said, in *Wall v. Pierpont,* supra, at page 436:

"Other provisions of the statute stand in their original integrity, and the section cannot be applied to marks or writings which it is not lawful to make (R. S. 25-416), or which render the ballot void (R. S. 25-419)."

But there is nothing in R. S. 25-416 which makes it unlawful for the voter to erase a mark which he himself made upon the ballot. In fact, the language of the statute may be interpreted to mean that such an act was not regarded as unlawful unless the erasing went to the extent of erasing a printed figure, letter or word on the ballot, or to the extent of defacing or tearing the ballot. In this case our commissioner consistently took the view that if the erasure was obviously made by the voter of something he had written on the ballot, and did not constitute an erasure of a printed figure, letter or word on the ballot, and did not despoil the ballot by making a hole in it, or tearing it, that the ballot should be counted, otherwise it should not. We regard that as the correct interpretation of the law. Our commissioner classified ballots so objected to and put them in groups, as nearly as possible. We have examined all of these and find it unnecessary to detail complaints made as to specific ballots, or to specific classifications. Under the interpretation

of the statute above made the rulings of our commissioner were correct. It is possible that as to a very few of the ballots some persons might reach a different conclusion than reached by him, but any criticisms of that character which might be made would result as much in favor of one side as the other. The record abounds with evidence of our commissioner's fairness in this respect, as in all other particulars relating to the hearing.

Having reviewed the objections to ballots counted by the commissioner, we have but one correction to make, and that is to deduct one ballot counted for Schaible which the voter marked with a pen, mentioned early in this opinion.

We turn now to the question of whether any of the ballots should have been counted from the first precinct of the first ward. Plaintiff contends the entire precinct should be thrown out because of fraud shown to have been practiced at that precinct. There was a total of 186 ballots cast at that precinct, of which fifty-two were voted for plaintiff and 114 for defendant. Twenty of the voters did not vote for either of the candidates. Our commissioner held one of the ballots voted for defendant to be void, making the result of the vote from that precinct a plurality of sixty-one for defendant. With respect to fraud at that precinct our commissioner found:

". . . that at least thirty-one votes were cast by persons unknown, in the name of registered parties in the first precinct, who had previously lived in said precinct, but had subsequently removed therefrom, or had died. I further find from the evidence that none of the judges or clerks of election assisted in or connived at the casting of said illegal votes. No evidence was produced showing for whom these illegal votes were cast, and I cannot ascertain from the evidence who received all the honest votes cast in said precinct; there were not sufficient illegal votes cast to affect the result. I find from the evidence that the judges discharged every duty enjoined upon them by the statute, no challenges were ignored by them, and there is no evidence showing that any judge knew or suspected any person who offered himself to vote was not qualified."

Our commissioner declined to throw out all the votes cast at the precinct. Plaintiff complains of these findings and the conclusions of the commissioner thereon. We have carefully examined all the evidence relating thereto and concur in the findings and conclusions made by our commissioner. Of the five persons who acted as judges and clerks at that precinct only one of them had previously performed similar service. One of the judges had previously

served, perhaps several times, on election boards and was quite well acquainted in the precinct. His work during the voting was to receive the ballots of the voters, clip the numbers from them, and put them in the ballot box. It is urged that he knew, or must have known, that some of the persons whose names were on the registration book had previously died or moved away, and that when some one called for a ballot in the name of such a person he knew that the person calling for the ballot was not the person whose name appeared upon the registration book. But the evidence is entirely lacking to sustain that charge, although it is possible it might be inferred as to one or two of such persons. There is no intimation that any of the other judges or clerks of the election knew, or had any suspicion, that any person who called for a ballot and gave his name and address and occupation as compared with the registration book was not entitled to vote. Two challengers were present throughout the voting, but no challenges were made. A police officer was there a part of the time, but there was no disturbance or controversy. The judge who handled the registration book refused a ballot to his own mother because her name did not appear in the registration book. She went to the election commissioner's office and got a certificate which enabled her to receive a ballot. There is not a thing in the conduct of the election or the counting of the votes which would justify a finding otherwise than those made by our commissioner. There is no contention that the election commissioner participated in or was cognizant of any fraud which took place in the election at this precinct. There is no claim or intimation that either of the parties to this action participated in it, or knew anything about it. There was no effort to show who cast the illegal ballots, or how many of them voted for plaintiff or for defendant. Perhaps some did not vote for either of them. Counting his sixty-one plurality in this precinct, defendant has a plurality of 140. Deducting his plurality in this precinct, which would be the effect, so far as this action is concerned, of throwing out all the ballots cast in that precinct, would leave defendant with a plurality of seventy-nine, and would not change the result. Approximately 155 people voted at this precinct against whom there is no charge of fraud. They are entitled to have their votes counted; at least they should not be disfranchised and have their votes thrown away because of the fraud of a few others with which they were not con-

nected, and with which none of the election officials was connected, and with which neither of the parties to this action was connected. We approve the holding of our commissioner that all of the votes from this precinct should not be thrown out.

From this review of the record it necessarily follows that judgment must be entered for defendant. It is so ordered.